IN THE

# SUPREME COURT

OF

# OREGON.

Argued December 3, 1895; decided February 17, 1896.

## SCHREYER *v.* TURNER FLOURING CO.

[43 Pac. 719.]

1. ASSUMPSIT — NOTE — ELECTION.— One who has loaned money and taken a note as evidence of the fact, may sometimes disregard the note and sue for the money loaned: *Black* v. *Sippy*, 15 Or. 574, cited and approved.

2. CORPORATIONS — RATIFICATION OF AGENT'S CONTRACT.— A corporation will be bound by a contract made on its behalf by its promoters or agents before organization, if, after it is organized, and with full knowledge of all the facts, it assumes the contract, and agrees to pay the consideration, or accepts and retains the benefits, provided the contract is one which the corporation might itself have made in the first instance.

3. PRESUMPTION FROM SUPPRESSED EVIDENCE — SECONDARY EVIDENCE.— Failure or refusal of a party to produce certain documents in accordance with a notice by his opponent renders secondary evidence of their contents admissible, and raises a presumption that such secondary evidence, if any is introduced, is less harmful than the original documents would have been, unless some sufficient or reasonable excuse is given for failing to produce them.

4. CONTRACT WITH PROMOTERS OR AGENTS OF CORPORATION — EVIDENCE OF RATIFICATION.— In an action against a corporation to recover money loaned to its promoters it appeared that upon the formal

29 1
a36 272

29 1
42 485

29 1
44 459

organization of the corporation soon after the loan was made these promoters became stockholders and officers; that the money was borrowed for the purpose of the corporation; that, after its organization, its secretary sent plaintiff one hundred dollars in part payment of the note given as evidence of the debt; that the secretary, in letters written to plaintiff on the company's letterheads, stated that he hoped they would have made enough money to pay plaintiff's debt before it became due. *Held* sufficient to go to the jury on the question as to whether the corporation adopted the acts of its promoters.

5. WITNESS — CROSS-EXAMINATION.— A witness who has testified on direct examination that he has destroyed a given receipt, in answer to a question asked solely to show the reason for its nonproduction, cannot be asked on cross-examination how he came to pay the money and get the receipt therefor.

6. IDEM.— A witness who has been asked in chief to produce a given note without any question as to its consideration, or as to the manner or purpose of its execution, cannot testify on cross-examination in what capacity he acted in the matters pertaining to such note.

APPEAL from Marion: GEO. H. BURNETT, Judge.

This is an action by C. J. Schreyer to recover money loaned to the Turner Flouring Mills Company, and the case is here on its appeal. It appears from the complaint that the defendant is a corporation; that its articles of incorporation were executed on the eighth, and filed in the office of the secretary of state on the eleventh day of April, eighteen hundred and ninety-three, and that it was on the said eighth day of April, ever since has been, and now is, a corporation, doing business at Turner, Marion County, State of Oregon, in its corporate name, the Turner Flouring Mills Company; that the purpose of the incorporation was to manufacture flour, and all and every kind of breadstuffs and other products of wheat and other cereals, and to do a general flouring-mill business, to buy and sell wheat and

other farm products, and to enable it to effect such purpose it was authorized to borrow money, and give its notes, bonds, debentures, and other obligations therefor; that prior to the incorporation, W. Dunbar, J. C. Robinson, and J. T. Brumfield were the owners of all the property acquired by defendant at its formation, and thereafter were its principal stockholders; that John Hallinan was an incorporator and stockholder, and ever since April eighth, eighteen hundred and ninety-three, has been and now is the managing agent, and said Robinson the secretary, of the defendant, and that Dunbar was then and for a long time subsequent thereto its president. It further appears that on said eighth day of April, at the instance of Hallinan, who was acting for and in behalf of defendant, the plaintiff loaned defendant one thousand dollars, and as evidence thereof Hallinan delivered to plaintiff the promissory note of Dunbar, Robinson, and Brumfield, bearing date April eighth, eighteen hundred and ninety-three, payable to plaintiff or his order in six months, with interest at eight per cent; that no part of said note was paid at maturity, except the accrued interest, but was renewed October sixteenth, eighteen hundred and ninety-three; that the sum of one hundred dollars was paid thereon May third, eighteen hundred and ninety-four; that plaintiff has demanded of the defendant the payment of the balance due on account of the money so loaned, but, though defendant has promised to pay the same, it neglects so to do. A demurrer was interposed to the complaint, which was overruled, whereupon the defendant filed its answer

which consisted entirely of denials, except that it admitted its incorporation, and that it owned a flouring-mill. The case went to the jury on these pleadings, and the court directed a verdict in plaintiff's favor.                    AFFIRMED.

For appellant there was a brief by *Messrs. Tilmon Ford* and *William M. Kaiser*, with an oral argument by *Mr. Ford.*

For respondent there were briefs and oral arguments by *Messrs. Geo. G. Bingham* and *Peter H. D'Arcy.*

Opinion by MR. JUSTICE WOLVERTON.

1. It may be premised that this is not an action upon the note executed as evidence of the indebtedness, but, disregarding the note, plaintiff sued for the money loaned to and received by the defendant and in this he is supported by settled law. *Black* v. *Sippy*, 15 Or. 574, (16 Pac. 418,) is a case wherein it appeared that goods were sold, delivered, and charged to the husband, who, upon a statement of account, executed and delivered his note for the amount found due, which was assigned to plaintiff, who sued the wife upon the account for family supplies, and the action was maintained. In passing upon the complaint, LORD, C. J., says: "Nothing is better settled than that accepting a note is not payment of an account, nor is accepting one note in renewal of another payment of the old note, unless there is an agreement that the note should be accepted in payment."

2. The objection made to the sufficiency of the complaint is that it shows upon its face the money was loaned to the defendant at a time when it could have no corporate or legal existence, as it appears that the articles of incorporation were not filed with the secretary of state until the eleventh day of April, eighteen hundred and ninety-three, three days after the loan was made. Conceding that the incorporation of defendant was not accomplished until its articles were duly filed with the secretary of state, and for that reason it had no legal existence on the eighth of April, eighteen hundred and ninety-three, is the objection vital to the complaint? · In considering this question it must be observed that the defendant answered over, and trial was had under the pleadings and issues thus joined, so that all reasonable intendments must go in support of the judgment. Most certainly it is true that a corporation must have an existence before it can assume to act or carry on business. The statute provides how a private corporation like this may be formed and organized, and prior to its lawful creation it is idle to think of its entering into contractual relations. After its organization it may transact such business as it is authorized and empowered to do by the articles of incorporation which give it individuality and being. Now, the plaintiff alleges that he loaned to the defendant, through its managing agent, acting for and on its behalf, the money which it is sought to recover, and April eighth is named as the date of the transaction. The defendant, while it may not have been *in esse* at the date fixed by the complaint, yet it could, at any

time after its organization, by adoption make the contract its own. It has been said that the adoption of a former contract is the making of a contract as of the date of the adoption: *McArthur* v. *Times Printing Company*, 48 Minn. 322 ( 31 Am. St. Rep. 653, 51 N. W. 216 ). In their primary significance, there is a manifest distinction between "adoption" and "ratification." The one signifies to take and receive as one's own that with reference to which there existed no prior relation either colorable or otherwise; while the other is a confirmation, approval, or sanctioning of a previous act, or an act done in the name or on behalf of the party ratifying, without sufficient or legal authority,—that is to say, the confirmation of a voidable act. But, as relating to contracts, some lexicographers treat them as synonymous. Rapalje thus defines "Adopt—adoption": "Of contract.— To adopt a contract is to accept it as binding, notwithstanding some defect which entitles the party to repudiate it." See Rapalje and Lawrence's Law Dictionary; see also Anderson, Dictionary of Law, '36. Now, as regards a contract made or an obligation incurred by the promoters of a corporation in the name of or for and in behalf of a contemplated corporation, it would seem that an adoption or a ratification thereof by the corporation after it had developed into a legal entity would mean one and the same thing, and would be accomplished by one and the same process. True, the promoters cannot be the agents of an unborn corporation; but, where they have assumed to act for it and to contract in its name, the approval and confirmation of such acts by

the corporation when organization has been duly accomplished is but the ratification of the acts of an unauthorized agent. And the result is the same whether we call it "adoption" or "ratification." But it is not very material here to determine whether, as relating to contracts, these terms are synonymous, or are capable of being thus distinguished, as they might be were the statutes of frauds or limitations involved. Suffice it to say authorities are not wanting which hold them to mean one and the same thing: See Thompson on Corporations, § 5321, and *Stanton* v. *New York Railroad Company*, 59 Conn. 285 ( 22 Atl. 300 ). The time of entering into the contract is not a necessary ingredient to the maintenance of this action: Bliss on Code Pleading, § 284. Mr. Thompson, in his excellent and elaborate treatise on the Law of Corporations ( Vol. IV. § 5325 ), says: "It has been held that in an action against a corporation upon a contract, it is not necessary for plaintiff to plead that the corporation has ratified the making of the contract, in order to introduce evidence of a ratification," citing *Collins* v. *Life Association of America*, 3 Mo. App. 586.

Now, to the main question. Although there is some conflict in the authorities, it has been maintained and settled in some jurisdictions that, while a corporation is not bound by engagements made for and in its behalf by its promoters before it has been duly organized, it may, after its organization, make such engagements its own. This it may do in manner and form and precisely as it may make similar original contracts. A formal action of the

board of directors is, however, indispensable in all cases where it would be necessary if the corporation was acting in the first instance. But it is not necessary that such adoption, ratification, or acceptance be expressed, as it may be inferred from acts or acquiescence on the part of the corporation, or by its authorized agents in its behalf, as similar original contracts may be established: *Battelle* v. *Northwestern Pavement Company*, 37 Minn. 89 (33 N. W. 327); *McArthur* v. *Times Printing Company*, 48 Minn. 322 (31 Am. St. Rep. 653, 51 N. W. 216); *Stanton* v. *New York and Erie Railroad Company*, 59 Conn. 285 (22 Atl. 300); *Buffington* v. *Bardon*, 80 Wis. 639 (50 N. W. 776); and Morawetz on Private Corporations, § 548. We adopt this exposition of the rule, as we believe it to be sustained by the weight of authority as well as founded upon the better reason. It will have to be conceded that the agreement must be one which the corporation itself could enter into, and one which the usual agents of the company have expressed or implied authority to make. But where, with full knowledge of all the facts, the corporation assumes the contract, and agrees to pay the consideration, or accepts and retains the benefits, it will be bound thereby: *Buffington* v. *Bardon*, 80 Wis. 639 (50 N. W. 776); *Leonard* v. *Burlington Mutual Loan Association*, 55 Iowa, 594 (8 N. W. 463); *Paxton Cattle Company* v. *First National Bank*, 21 Neb. 621 (59 Am. Rep. 852, 33 N. W. 271); *Grand River Bridge Company* v. *Rollins*, 13 Colo. 4 (21 Pac. 897). It is alleged here, not only that the contract was made for and in behalf of the corporation, but that it had

promised to pay the balance sued for, and it sufficiently appears that the parties contracting in its behalf were its promoters and organizers. It further appears by the testimony that it is highly probable the defendant received, accepted, and used the money to recover which this action was instituted. Under such circumstances, the objection to the action of the court in overruling the demurrer cannot be sustained.

3. When the plaintiff had rested his case, the defendant moved for a nonsuit, which the court denied, and this is assigned and relied upon here as error. This involves to some extent a review of the testimony offered and admitted in support of the action. The answer puts in issue many of the material allegations of the complaint, but we take it that this much is admitted,—*first*, that Robinson, Brumfield, and Dunbar were the principal stockholders of the corporation; *second*, that Robinson was at all times its secretary; *third*, that John Hallinan may have been its managing agent on the eighth day of April, eighteen hundred and ninety-three, and much if not most of the time since; and, *fourth*, that defendant had a corporate existence at some time since April eleventh, eighteen hundred and ninety-three. Before the trial, and in due time, defendant was notified in writing by plaintiff to produce for his use as evidence at the trial a receipt given by plaintiff to defendant for one hundred dollars about May third, eighteen hundred and ninety-three, the surrendered note, the records of the meetings of de-

fendant, its books of account, in which were kept the transactions of defendant, especially with plaintiff, and a letter written to Dunbar April fourth, eighteen hundred and ninety-three, by plaintiff. Answering this, the defendant stated that it had "nothing in its possession, or under its control mentioned in said notice except its books of account with the plaintiff," which it proffered to produce. John Hallinan testified, among other things, that he was president, manager, and bookkeeper of the defendant company. When asked for the surrendered note he answered, "I have not got it." Then as he was interrogated he responded as follows, which we shall have occasion to refer to later on: "Question.— I ask you as an officer of the defendant corporation to produce that note. Answer.— The original note I sent to Portland immediately. Q.— To whom? A.— To Mr. Robinson. Q.— Who is Robinson? A.— Secretary of the company. Q.— Then the receipt for one hundred dollars payment made by you as agent of the company to the plaintiff on or about the third day of May? A.— I have not got it; I destroyed it. Q.— Then the minute-book of the company? A.— I have not got that; they are in Portland; I don't keep any of the accounts in Portland. Q.— What books of your own have you got? A.— My ledger. Q.— Is there another kept in Portland? A.— They keep books in Portland. I have nothing to do with them. Q.— You were asked to produce the books of account in which the account with this plaintiff are kept. A.— I have got it. Q.— With reference to this note? A.— There is nothing about the note in it. I never

made any entry of these things in my books at all.
Q.—They are made in Portland? A.—Yes, sir."
Nor was the witness able to produce the letter to
Dunbar of April fourth, eighteen hundred and
ninety-three. The defendant's failure or refusal to
produce the documents called for by the notice can
not be considered as evidence of the truth of what
plaintiff claims he would be able to prove by them;
that is, that to a greater or less extent they would
have a tendency to prove his case. It did, however,
open wide the doors for the introduction of secon-
dary evidence; and if any such were introduced,
from which the truth of such claims could reasona-
bly be inferred, the nonproduction of the primary
evidence, unless attended with some sufficient or rea-
sonable excuse therefor, would strengthen the infer-
ence. As the introduction of inferior evidence, when
higher or primary evidence is at hand, would create
a presumption that the higher or primary would be
adverse if produced, so, if a party, when legally
called upon to produce the best evidence, if within
his power to do so, fails to comply with the demand,
and allows his adversary to proceed with the intro-
duction of secondary evidence, the presumption will
obtain that the higher evidence would be more hurt-
ful to him than the secondary, and thus strengthen
the inference to be drawn therefrom. See Hill's
Code, § 776, subdivisions 5 and 6, and *Connell* v. *Mc-
Laughlin*, 28 Or. 230 (42 Pac. 220).

4. The testimony further shows that plaintiff
became acquainted with Hallinan in September,

eighteen hundred and ninety-one, and with Dunbar some time before the money was loaned; the latter having sent him up from Portland to take charge of the mill. He had not seen either Robinson or Brumfield until after the company had been formed. His first conversation with Hallinan in regard to the money in controversy took place on April fourth, eighteen hundred and ninety-three. Hallinan told him that Dunbar, Robinson, and Brumfield had bought the Oregon Flouring Company's stock,—that is, the Turner Flouring Mills,—and that to enable them to start up and run the mill they needed the one thousand dollars which he had in the bank, and wanted him to loan it to them, to which plaintiff consented, and, at Hallinan's request, wrote a letter to Dunbar, offering to loan them the money. To this letter Dunbar replied: "I am very much obliged to you for your kindly wishes, and for your financial assistance and offer of one thousand dollars to assist us in getting the mill started again. I gladly accept of your offer, and will send you up note, made and signed by all of my partners here." Upon Hallinan's advice, plaintiff went to Salem on April sixth or seventh, and made out a check for the money upon the First National Bank, payable to John Hallinan or order. After returning on Saturday, the eighth, in the morning, plaintiff, at Hallinan's request, went from his house over to the mill and handed him the check, when he (Hallinan) laid down the note for plaintiff signed by Dunbar, Robinson, and Brumfield, which plaintiff took home with him. At the same time Hallinan gave plain-

tiff the key, and turned the mill over to him to take charge of in his absence, and then went to Portland on the one o'clock train, taking the check with him. On his return the following Tuesday, he told plaintiff that "he was just come up from Portland and arrived in time when the persons were assembled to form the company, and the deeds were signed, and the company met the same afternoon, and my check was handed in to the company, and they would be able to start the mill up in a few days." On October twelfth Hallinan paid the interest on the note, and on the sixteenth a new note was given, it having been sent from Portland by Robinson. The old one was then taken up by Hallinan. Plaintiff wrote several letters to the company, and others to the secretary and Mr. Dunbar regarding the note, demanding payment in some of them. On the fourth day of May, eighteen hundred and ninety-four, Robinson sent up one hundred dollars from Portland, and Hallinan paid it to plaintiff upon the note. For this money plaintiff gave a receipt running in the name of Turner Flouring Mills Company, which Hallinan accepted. Plaintiff testified that in writing to Dunbar he proposed to lend the money to the Turner Flouring Mills Company, and that, in accord with the proposal, did lend to the company. Several other letters were introduced, some from Robinson, and some from Dunbar. Those from Robinson were written upon the letterheads of the company, whereon was printed "W. Dunbar, President, J. C. Robinson, Secretary."

In one, bearing date December sixth, eighteen hundred and ninety-three, Mr. Robinson, after commenting somewhat upon Dunbar's unfortunate litigation growing out of the smuggling cases, says: "Under any circumstances the rest of the trial will not have any effect on the position of the company. At the worst, even if Mr. Dunbar could not go on with the business, the other partners hold a majority of the stock, and can carry on just the same, and Mr. Dunbar's stock cannot be touched by any one. I don't think you need have the least fear as to the result. You know how poor a season there has been ever since we started; yet, in spite of that, we have been able to pay off Balfour, Guthrie and Company for all the fixtures, stores, and book debts of the old company, so that everything is now our own. We have also paid the eight hundred dollars which Mr. Crocker lent us, and now we owe no one except yourself and the bank, and the bank of course is well covered. I think if we have been able to do so well in poor times, our prospects ought to be very good in ordinarily fair seasons. The fact is, our expenses here are very small, and all that Mr. Dunbar and myself take out of the business is fifty dollars a month each. It is not enough to live on, but we are determined to leave every dollar we can in the business until times are better. *  *  * I hope that long before your note is due we will have made enough money to pay it with ease. We could do it now if our flour was sold, for we should have a nice surplus. I hope this explanation will satisfy you. You know I manage everything relating to the

finances, and neither Mr. Dunbar or any one else can draw a dollar without me, and my endeavor all the time is that every one who does business with us shall have full confidence in us. * * * The money you lent us has been very helpful to us, and you may depend on my doing everything to safeguard your interest. If everything goes well I will have some money of my own to spare in a day or two." On March second, eighteen hundred and ninety-four, Robinson writes: "I can see no way in which we can take up your note this month. * * * I hope that by the end of the month we may get orders that will justify us in running the mill, and so be able to pay you at least part of the note." On April sixth he writes: "We told you we considered the note due on the earlier date, and would so enter it on our books. We continue to press our collections, but we depend on our remittances from China to pay your note." Dunbar writes April twenty-seventh, eighteen hundred and ninety-four: "Had I known what was before me I would have left the milling business alone, but, as it now is, my friends are in it, and I will do all I can to work it out. That will take time. I have got nothing out of it since November last, and before that fifty dollars a month; so all that the mill has earned has been paid in wages at Turner." On April thirtieth Robinson writes again: "I am going to send down to Mr. Hallinan tomorrow for you one hundred dollars. I can not get it today, but am confident about it tomorrow. I was in hopes to have done better for you, but the taxes must be paid, and it takes all I can get hold

of. We have got orders that will keep the mill going for a little time, and the price is a little better, so I hope if business keeps up to send you money regularly." Miss Bertha Schreyer, the sister of plaintiff, testified that Hallinan told her on April fourth, eighteen hundred and ninety-three, that they had bought the mill, and were starting a new company, and that Robinson and Brumfield were connected with it. Afterwards Hallinan told her that at first Dunbar was president, but that later he became the president; and he told Watson that Dunbar, Robinson, Brumfield, and himself were the company. The note was offered in evidence, to be surrendered to defendant. This evidence would seem to indicate that Hallinan borrowed this money for the defendant corporation, that it has had the benefit thereof, having used the same in its business, that it has adopted or ratified the acts of its officers in borrowing for its use and benefit, and thereby undertook to repay the same; hence the motion for nonsuit was properly overruled. As supporting this conclusion see *Pittsburg Mining Company* v. *Quintrell*, 91 Tenn. 693, 20 S. W. 248; *Paxton Cattle Company* v. *First National Bank*, 21 Neb. 621 ( 59 Am. Rep. 852, 33 N. W. 271 ), and *Whitney* v. *Wyman*, 101 U. S. 392.

5. It is next claimed that the court erred in refusing to allow Hallinan, upon cross-examination, to answer the following question, namely, "Now, you were asked about some receipts for some money which you paid, the attorney said, to the plaintiff Schreyer; now you may state how you came to pay

that money, and get that receipt for it." By refer-
ring back to Hallinan's testimony it will be seen
that he was merely asked in chief concerning the
whereabouts of the one-hundred-dollar receipt, and
he answered: "I have not got it; I destroyed it."
Nothing was asked him concerning the payment of
the money. The sole purpose of the inquiry in
chief was to show the nonproduction of the receipt
on the part of the defendant after it had been noti-
fied to produce it, so as to permit the introduction
of secondary evidence of its contents. In this view
there was no error in sustaining the objection.

6. The witness was further asked, upon cross-ex-
amination, the following questions, namely, "I will
ask you if in taking up that old note which the at-
torney called your attention to, which you say you
forwarded to Robinson in Portland, if you did so as
the agent of Robinson, Brumfield, and Dunbar, and
not as the agent of the Turner Flouring Mills Com-
pany?" "Did you act in the capacity as agent or
president of the Turner Flouring Mills Company,
the defendant in this action, in the matter pertain-
ing to this Schreyer note sued upon?" To which
an objection was made as not proper cross-examina-
tion, and sustained by the court, and such ruling is
assigned as error. The same answer is applicable
here as to the preceding assignment. The witness
was only asked in chief to produce the old note.
He was not interrogated as to the consideration, or
as to how or for what purpose it was executed. So

29 C.R.—2.

the objection to these questions was also properly sustained.

Another error is assigned which is predicated upon the court's admission in evidence of several exhibits, consisting of letters written to plaintiff from time to time by Dunbar and Robinson, concerning the money which is the subject of the action. Some of these letters were written upon the letterheads of the Turner Flouring Mills Company, but the context of all were more or less concerned with the money transaction about which the controversy arose, and we think for this reason, if for no other, the exhibits were admissible. This disposes of all the objections maintained here, and the judgment of the court below will be affirmed.        AFFIRMED.