Argued March 5, modified April 21, petition for rehearing
denied June 23, 1965

# DOYLE *v.* CHLADEK ET AL, HUSTON, KRING

401 P. 2d 18
403 P. 2d 381

*Gordon G. Carlson* and *Edward M. Murphy,* Roseburg, argued the cause and filed the brief for appellant.

*Fredric A. Yerke, Jr.,* Portland, argued the cause for respondents Huston and Kring. On the brief were King, Miller, Anderson, Nash & Yerke, Portland.

Before McALLISTER, Chief Justice, and SLOAN, GOODWIN, HOLMAN and LUSK, Justices.

## HOLMAN, J.

Plaintiff is receiver for the Senior Citizens Land and Development Co., an insolvent Oregon corporation. This suit is brought to recover on subscriptions to the capital stock of the corporation which plaintiff claims are owed by the defendants. The only defendants with which the court is now concerned are the defendants Huston and Kring, as the litigation concerning the other defendants has been otherwise concluded.

Senior Citizens Land and Development Co. was formed for the purpose of furnishing housing for the elderly. At first it was intended that this be done with new housing, but that intent was abandoned and equities in two older hotel properties were purchased.

The corporation was organized in October of 1960. The incorporators were three in number: the defendant Huston, an individual by the name of Giles Florence who can be best described as the promoter, general manager, and guiding spirit of the enterprise, and

one Edwin G. Schacher. Florence must have been a person of great persuasive power and personality, for the evidence indicates his hold over the defendants was nothing less than incredible.

In November of 1960 both of the defendants subscribed in writing for 30,000 shares of capital stock at 50 cents per share. Both were subsequently elected to the board of directors. Defendant Huston also was on the original executive committee of the board of directors, and at one time was vice president. The record is not clear as to how long he occupied these positions. He testified "a short time," but there are no corporate records indicating that his tenure as either a member of the board of directors or its executive committee was ever terminated. There is evidence that he was still a member of the executive committee in August or September of 1961.

The defendant Kring was at all times relevant a member of the board of directors, president from February to December of 1961, and secretary-treasurer for three to four months thereafter. He became a member of the executive committee of the board of directors at the same time he became president.

The business was operated for a little more than a year. It steadily lost money from its inception. Early in 1962 Florence made a deal, acquiesced in by all the shareholders, to exchange all of the Senior Citizens stock for that of another corporation, and operations by the officers of Senior Citizens thereupon ceased. This transfer was subsequently set aside by the United States District Court for Oregon because of misrepresentations by Florence.

By this time the die was cast. In the trial of this case in circuit court the trial judge analyzed the situ-

ation as follows: "The company was underfinanced because of the failure of stock subscribers to pay for their stock. As is to be expected, the house of cards has collapsed."

*Concerning the Defendant Huston*

Huston originally became acquainted with Florence when Florence sold him 150 shares of stock in Professional Business Men's Insurance Co. (hereafter referred to as PBMI) for $150 per share. At the time of this sale Huston paid part in cash and the balance of $20,000 in the form of a note. Florence was to deliver the stock on payment of the note. Subsequently, When Florence began to promote the company here in question, he again contacted Huston and interested him in it.

Huston did not pay for his stock subscription in Senior Citizens though the stock was issued to him. It was originally anticipated that he would transfer a piece of real property to the corporation in payment for his stock. The property was never transferred because it was not possible to reach an agreement as to its value.

At a time Huston describes as after September 7, 1961, he claims he had a telephone conversation with Florence during which they agreed that (1) Florence would retain the PBMI stock on which Huston had then paid approximately $14,000, (2) Florence would assume the balance of approximately $8,000 on Huston's note given for the PBMI stock, which note had been hypothecated by Florence with Huston's consent, (3) Florence would credit on Huston's Senior Citizens stock subscription the $14,000 paid on the PBMI stock and give him credit for an additional $1,000 for work

done for the corporation, thus paying Huston's subscription in full.

There is no evidence that such an arrangement was ever considered or sanctioned by the board of directors of the corporation. Neither the PBMI stock nor any sum of money was ever transferred by Florence to the corporation for Huston's account. It was extremely doubtful that the PBMI stock was worth more than 50 per cent of what Huston paid for it. He admitted subsequently selling another block of the same stock for between $70 and $80 per share. Huston testified concerning his agreement with Florence as follows:

"Q  Now, exactly what did he agree to do?

"A  He agreed to pick up this stock, the unpaid balance on this note in whatever it was, $8,000 or whatever it might have been, and credit me with the over $14,000 to pay off the Senior Citizens. And that was the—in a nutshell just what happened.

"Q  Did he agree to transfer the PBMI stock to Senior Citizens?

"A  We didn't go into that phase of it. Just that the money that was accumulated there would pay off my indebtedness.

"Q  Was it your understanding that he would transfer the PBMI stock to Senior Citizens?

"A  No. It was money I was talking about, the amount of money I had paid.

*          *          *

"Q  That's my point, and my question is, you knew that your commitment in the subscription agreement to pay $15,000 was not to Giles, but was in favor of the company?

"A  But here's the thing. If you had operated— I don't care, you might go into a store for months and months and months and the person that waits on

you, you might think it's the owner. Actually, that's the way this thing was because he had handled every phase of this business, every phase of it, and I had confidence in the man that he was going to do just exactly what he said by telephone. That's exactly what happened."

While Huston had rendered services to the corporation, he at no time had any agreement as to payment. He testified as follows:

"Q Did you ever submit a bill to the Senior Citizens corporation for your services?

"A No, sir.

"Q Did you keep a time record?

"A No.

"Q Was there ever an agreement by the directors or any other body representing the corporation to pay you for your services?

"A No.

"Q Did you expect to be paid when you performed the services?

"A No. I thought it was a good investment and eventually it would be—the returns on it would be my pay.

"Q Do you know whether or not the corporate records disclose any obligation to you for services?

"A Not that I know of."

The trial court found that Huston dealt in good faith with Florence, the general manager of the corporation, relative to applying the money he paid on the PBMI stock on his subscription to Senior Citizens and that the difference to equal a total paid value of $15,000 was supplied by the value of services Huston rendered to the corporation. The court, therefore, held that Huston owed nothing on his subscription.

■ Presuming that Huston dealt in good faith with Florence, it still does not absolve him of his obligation to the corporation on his stock subscription. The $14,000 was paid by Huston on a personal debt owed by him to Florence. It had absolutely nothing to do with corporate business. Florence promised to pay the money, which was his, to Senior Citizens for Huston's account if Huston gave up his equity in the PBMI stock. This was a private, personal undertaking by Florence and not an undertaking of the corporation. Only if Florence did pay was Huston's debt to the corporation on his stock subscription extinguished. Huston was defrauded in a private transaction with Florence.

■ The set off of Huston's services against the stock subscription was not bona fide. There was never any agreement by the corporation to pay Huston for his services. Huston admitted he did not anticipate being paid when he performed them. The services may have been valuable to the corporation, but this is beside the point.

*Concerning the defendant Kring*

The defendant Kring gave a $12,500 note together with $2,500 in cash in return for a certificate for 30,000 shares of stock in the corporation. In August or September of 1961, at what purported to be a directors' meeting, the corporation returned Kring's note and received back the 30,000 shares of stock. Also, a new certificate was issued to him for 12,500 shares which represented 5,000 shares for the $2,500 he had paid in cash and 7,500 shares for services and as payment for guaranteeing a note of the corporation. No reason was given for the return of the note to Kring in exchange for the certificate for the 30,000 shares. Kring's

testimony concerning the entire transaction is best summed up when he testified as follows:

"\* \* \* at a subsequent meeting in August or September perhaps this whole thing was resolved as I have indicated. I turned back my 30—certificate for 30,000 shares and received my note for $12,500 plus the 5,000 shares I had paid for plus the $7,500 [sic], which was consideration for the guarantee which we had already gone on the note for and services."

At this meeting there were present Kring, who was president, Florence, and one Mathis, the secretary, who were members of the board of directors. Originally there were at least nine directors and there is no showing that this situation did not continue. At the same meeting Mathis' note, given for his stock subscription, was also returned to him. Mathis says minutes of the meeting were kept, but there is no corporate record of them.

The trial judge ruled that the return of the note to Kring was not valid but he was still liable on his stock subscription. He further held Kring was entitled to an offset on his stock subscription as he had performed services of the value of $6,500 for the corporation and that he therefore owed the corporation a balance of $6,000.

There is little difficulty in disposing of the problem of the purported return of Kring's stock in exchange for his note. It is obvious that the transaction was not the act of the corporation. The articles of incorporation provide:

"Meetings of the Board of Directors \* \* \* shall be held in such manner \* \* \* as by law provided and as determined specifically by the by-laws of the corporation."

The bylaws of the corporation provide:

> "A majority of the number of Directors shall constitute a quorum for the transaction of business at any special or regular meeting of the Board of Directors. * * *."

■ There was no quorum of the board of directors, and the attempted action of the three participants was a nullity and was nothing to which the corporation was a party.

■ If it is claimed the meeting of Kring, Mathis, and Florence was a meeting of the executive committee and not the board of directors, this is not the type of decision the executive committee had the power to make. The bylaws provide:

> "The Board of Directors may appoint and designate an Executive Committee consisting of no more than five persons to have and exercise administrative and ministerial authority in the management of the corporation. * * *."

Authorizing the return of Kring's note in exchange for the return of his stock was not an administrative or ministerial act. The purported recision is set aside as not being the act of the corporation.

The issuance of the additional 7,500 shares of stock to Kring, partially for services and partially for guaranteeing the note of the corporation, accomplished at the same meeting, comes within the same category. They were unauthorized unless there appears to be other authority for the action.

The records of the corporation show minutes of a board of directors meeting on July 1, 1961, which recite as follows:

> "Mr. Florence moved that Jack Mathis and Harvey Kring be given notes as security on the

$7200.00 borrowed from Douglas County Bank in which they signed as indemnitors. Each note to consist of one half of mortgage plus interest or the holders of notes may elect to accept stock at $ .50 per share to cover the obligation. Motion was seconded by Ed Schacher. Motion carried."

■ It is obvious that whatever stock was issued to Kring because of his guaranty of the note was for the purpose of security against possible loss. When no loss developed, there was no basis for his retention of the stock.

There was never any valid agreement by the corporation to pay Kring for his services, nor did Kring really expect to get paid. More particularly, there was never any agreement to give him stock for services.

Kring testified as follows:

"Q Now, in regard to your services, Doctor, did you ever submit a bill to the corporation?
"A I don't believe so.
"Q Did you expect to be paid when you performed these services?
"A Eventually.
"Q Do you recall testifying at the trial in Portland between Senior Citizens and Reliance Corporation? Do you recall testifying, Doctor?
"A Yes.
"Q Page 232. Were you asked these questions and did you give these answers? 'Question: Now, in answer to one of Mr. Yerke's questions you have stated that you were never paid any compensation for whatever services you rendered to Senior Citizens, is that correct? Answer: No cash payment; not on the property. Question: You didn't expect any compensation for those services, did you? Answer: Not necessarily, no.' Were you asked those questions and did you give those answers?
"A I think so.

"Q Do the corporate records contain any notation of any obligation to you for services?

"A Not that I am aware of.

"Q Did anybody acting on behalf of the corporation ever agree to pay you anything for your services?

"A Just the issuance of 7,500 shares of stock."

We do not have to decide the propriety of corporate officers dealing among themselves, by a sort of mutual back scratching, forgiving each other their obligations on stock subscriptions and notes at a time when the business of the corporation had been consistently losing several thousand dollars each month. It is unnecessary, as the acts in question which are depended on for a defense were not valid acts of the corporation in any event.

This suit was brought by the receiver on the stock subscription rather than the note. The defendant Kring, in his first affirmative defense, pleads that he paid the corporation $2,500 in cash and delivered to it his promissory note for the sum of $12,500. We interpret this as an attempt to plead the defense of payment so that Kring would no longer be liable upon his stock subscription though he might be on his note.

There is considerable controversy as to whether a corporation can accept notes in payment of stock subscriptions. Some courts have held that notes may not be so received. Many states have prohibited it by statute. Section 18 of the Model Business Corporation Act specifically prohibits it.

In Oregon it would appear that it is proper for a corporation to receive the note of a stock subscriber. When section 18 of the Model Act was adopted by the

legislature, (ORS 57.106) that part prohibiting the payment of stock subscriptions by the giving of notes was deleted. It now reads that the consideration for the issuance of shares may be the giving of property tangible or intangible. The articles of incorporation issued by the state to the corporation authorized the receipt of notes in payment for stock. The case of *Empire Holding Co. v. Coshow,* 150 Or 252, 261, 41 P2d 426, 43 P2d 907, 45 P2d 167, decided prior to the adoption of the Model Act, held that a corporation may take in payment for stock the promissory note of the subscriber.

■ This does not necessarily mean that a corporation must sue on the note and that the debt on the stock subscription is extinguished. The law in Oregon, as demonstrated by a long series of cases, is that the giving of a note does not extinguish the debt for which it was given unless the parties have intended or agreed that this be so. *Black v. Sippy,* 15 Or 574, 576, 16 P 418; *Johnston v. Barrills,* 27 Or 251, 256, 41 P 656; *Clarke-Woodward Drug Co. v. Hot Lake Sanitorium Co.,* 75 Or 234, 238, 146 P 135; *Pennick v. American National Bank,* 126 Or 615, 620, 268 P 1012; *First National Bank v. Noble,* 179 Or 26, 38, 168 P2d 354.

■■ Prima facie, the note is conditional payment only, *First National Bank v. Noble,* supra. In the absence of a contrary showing, the giving of the note operates only to extend until its maturity the period for the payment of the debt. *Black v. Sippy,* supra, at 576.

It does not appear to make any difference, in deciding whether the note was absolute or conditional payment only, whether the note was given for an antecedent debt or a present exchange for property. *Sav-*

*age v. Savage,* 36 Or 268, 272, 59 P 461; *Schreyer v. Turner Flouring Co.,* 29 Or 1, 4, 43 P 719. Williston on Contracts, revised edition, Volume 6, § 1875F, page 5274, states as follows:

> "* * * When a bill or note is given for a debt contemporaneously created, there is more difference of opinion; but generally here also it would be held merely conditional payment. * * *"

■ Prima facie, the giving of the note did not extinguish the obligation on the stock subscription. It is therefore necessary to examine the facts to see whether there are other circumstances sufficient to overcome the case for conditional payment. There is no testimony which throws any light on the question one way or the other except the showing that the stock was issued by the corporation to Kring.

It is contended that the giving of the note must have been intended as absolute and unconditional payment as otherwise the corporation had no power to issue the stock because of ORS 57.121 (4) which is as follows:

> "No certificate shall be issued for any share until such share is fully paid."

We might be a little more impressed with the argument if we did not have before us many illustrations of the corporate officers grossly disregarding the law and the niceties of authorized corporate procedure and authority. An illustration would be the issuance of $15,000 worth of stock to the defendant Huston for which he gave nothing—not even a note. Under these circumstances the delivery of the stock to Kring was not very meaningful.

We see no reason, in this case, why the legal implications of the giving of a note for the issuance of

shares of stock should be any different than if it were given for the purchase and delivery of a cow. The corporation, in taking the note, received only another promise to pay for the stock.

This case is being brought for the benefit of creditors of the corporation against its president on his stock subscription. We are not inclined to stretch any points in favor of the president relative to the intention of the parties concerning a transaction between him and the corporation when we have a history of utter disregard for the niceties of corporate authority and procedure and there can be serious doubt that he at all times dealt at arm's length with the corporation.

The case of *Empire Holding Corp. v. Coshow,* supra, is cited as authority for the proposition that the giving of a note under such circumstances is unqualified payment which extinguishes the obligation on the stock subscription. Coshow is authority for the proposition that a note may be legally taken by a corporation in exchange for stock and that the obligation on the stock subscription is extinguished where it was shown that it was the intent and agreement of the parties to take the note as payment. In *Coshow,* the board of directors passed a resolution as follows:

> "* * * upon furnishing promissory notes by the board of directors for the stock subscribed by them said note shall be accepted as payment for stock in an amount not to exceed 200 shares. This to apply to all directors who subscribe for this amount prior to January 1, 1931."

It is our finding that there is no evidence sufficient to overcome the prima facie case for conditional payment only. The note being past due, the re-

ceiver may sue on either the underlying debt on the stock subscription or the note, as he chooses.

The decree of the trial court is modified in that judgment will be given in favor of plaintiff and against the defendant Huston in the sum of $15,000 and against the defendant Kring in the sum of $12,500, both judgments with interest at 6 per cent from November 16, 1960.

**ON PETITION FOR REHEARING**

King, Miller, Anderson, Nash & Yerke and Fredric A. Yerke, Jr., and Jean P. Lowman, Portland, for the petition.

Edward M. Murphy and Gordon G. Carlson, Roseburg, contra.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell, Goodwin, Denecke and Holman, Justices.

HOLMAN, J.

Defendants Kring and Huston have filed a petition for rehearing raising the sole question of the propriety of the court's decision (*Doyle v. Chládek,* 240 Or 598, 401 P2d 18), in assessing interest on the amounts of the judgments from November 16, 1960, the day the subscription agreements for stock were signed.

Defendant Kring contends that the proper date for the commencement of interest on the amount of the judgment against him would be May 16, 1961, which was the due date on the note he gave for payment of the balance he owed for the purchase of the stock.

As Kring's obligation to pay did not mature until the note was due and as the plaintiff sued him upon the stock subscription rather than the note, petitioner is correct. Interest is assessed upon the amount of the judgment against Kring from May 16, 1961, only.

Defendant Huston contends the proper date for the commencement of interest on the judgment against him is March 5, 1963, the date the court authorized the receiver to sue. Huston originally agreed to pay for the stock by the transfer of real property to the corporation. Huston and the corporation could not agree upon a valuation of the property and the transfer was never made. It is true that for a time the books of the corporation showed the property as having been transferred, but the books were not famous for their accuracy; and in fact the transfer did not take place. The date in the subscription agreement for payment by the subscribers is not in evidence.

ORS 57.090(2) provides as follows:

"Unless otherwise provided in the subscription agreement, subscriptions for shares, whether made before or after the organization of a corporation, shall be paid in full at such time, or in such instalments and at such times, as shall be determined by the board of directors. * * *"

The Articles of Incorporation provided:

"Subscriptions for shares of this corporation * * * if made after November 1, 1960 shall be paid in full at the time of making the subscription or in such installments and at such times as shall be determined by the Board of Directors; this corporation shall not be permitted more than ten subscribers."

In the absence of knowledge as to the provisions for date of payment in the subscription agree-

ment, the statute would not require payment until a call was made. The Articles would require payment at the time of making the subscription unless the board of directors determined otherwise. The board consented to payment by Huston by the transfer of property which did not mature. This necessarily contemplated a delayed payment as no agreement for valuation had been reached at the time of the subscription. After the transaction fell through—of which the Board must have had knowledge, despite what was shown on the books—they made no demand or call upon Huston. A delayed payment having been contemplated for which no actual date was set, we do not believe Huston was required to pay, after the intended means of payment failed, until a call was made upon him. The order of the court authorizing the receiver to sue upon the unpaid subscription acted as an automatic call: Fletcher, Cyclopedia of the Law of Private Corporations (1961 Rev.) Vol. 13, § 6089, page 758. Interest is assessed on the amount of the judgment against Huston from March 5, 1963, only.