STEINMETZ, et al, Appellants, v. SCHULTZ, Respondent.

(241 N. W. 734.)

(File No. 7260. Opinion filed March 29, 1932.)

*J. A. Donohoe,* of O'Neill, Neb., *Henry G. Meyers,* of Omaha, Neb., and *Windsor Doherty,* of Winner, for Appellants.

*P. J. Donohue,* of Bonesteel, and *Charles A. Davis,* of Burke, for Respondent.

CAMPBELL, P. J. On September 5, 1925, Lizzie Schwaller (formerly Schmitz) was the fee owner of certain land in Gregory county, subject to the following incumbrances: Real estate taxes in the amount of $90.61; a first mortgage held by the Federal Land Bank for $2,089 with some interest; a second mortgage held by one Brockman, on which there was due approximately $4,800; a third mortgage held by Citizens' Bank of Bonesteel, on which there was due approximately $1,494.

On that day Schwaller and her husband executed and delivered to the third mortgagee, Citizens' Bank of Bonesteel (which will be hereinafter called the Bonesteel bank), in consideration of the satisfaction of the third mortgage and release of the indebtedness thereby secured, a warranty deed to the premises in question with the space for the name of the grantee left blank, together with written authority to insert as grantee in said deed the name of any person to whom Bonesteel bank might convey the land.

On the same day Bonesteel bank contracted in writing to sell the land to Frank Schultz for the sum of $6,525, the bank agreeing to deliver to Schultz good marketable title, free of all incumbrances, excepting only the first mortgage to the Federal Land Bank, above mentioned, with interest thereon after September 1. Two days later Schultz paid to the bank the full consideration of $6,525. The bank filled in the name of Frank Schultz as grantee in the Schwaller deed, and the deed was duly recorded. The bank also opened upon its books an acount entitled "Schultz Land Account" and deposited therein the $6,525 paid by Schultz.

By checks on that account, the bank paid to itself the amount due it on the third mortgage which it had released to Schwaller, and paid interest on the Federal Land Bank mortgage up to September 1.

One Criss was president of the First National Bank of Stuart, Neb., and was acting as agent for Brockman, holder of the second

mortgage on the premises. Brockman had acquired the second mortgage by previous assignment from Criss, as administrator of the estate of one Eggenberger to whom the mortgage originally ran. Early in September the Bonesteel bank was negotiating with Criss by letter and telephone for satisfaction of the second mortgage, starting their negotiations apparently on the supposition that the mortgage was still owned by the Eggenberger estate. The Bonesteel bank suggested payment of the principal amount due on the mortgage in return for satisfaction, whereupon Criss wrote them in part as follows: "I have talked to our party here who has been carrying this mortgage since I made settlement with the estate and he does not want to throw off the interest on the mortgage. If you can not see your way clear to take this up with interest kindly advise me at once. If you care to take up advise and I will send you proper releases of mortgage." On October 26, 1925, Criss went to Bonesteel with all necessary documents, including assignment to Brockman and satisfaction by Brockman, to clear up the second mortgage of record. Criss and Bonesteel bank, on October 26, computed the amount due on the second mortgage at $4,852.22. The Bonesteel bank drew a check for that amount against the "Schultz Land Account" to the order of "Draft." They marked this check paid and issued their own cashier's check for a like amount, which was made payable to the First National Bank of Stuart, Neb. (of which Criss was then president). Criss accepted the cashier's check, turned over the satisfaction papers, and went home. The cashier's check was deposited in the First National Bank of Stuart, Neb., forwarded for collection through Omaha, presented for payment to the Bonesteel bank on November 4, 1925, and protested for nonpayment on that day, the bank having closed its doors and ceased doing business on November 3. The satisfaction of the second mortgage by Brockman was filed for record November 2.

The cashier's check given to Criss when he delivered the satisfaction of the Brockman mortgage has never been paid. Brockman died, and plaintiffs, as his successors in interest, have instituted the present action against Schultz. The complaint proceeds upon the theory that the Bonesteel bank, in securing the satisfaction and delivering the cashier's check to Criss, was acting as the agent of Schultz, and the prayer is for the reinstatement of the mortgage

lien and foreclosure thereof. The answer consists of a general denial with certain fact admissions not here important, and a counterclaim alleging that Schultz is the fee owner of the premises and asking to have his title quieted thereto against all claims of lien or incumbrance on the part of the plaintiffs. To the counterclaim plaintiffs interposed a general denial, and upon the issues so made the matter came on for trial.

The learned trial judge found the facts substantially as hereinbefore recited, and, in addition, specifically found that the sum of $6,525 paid by Schultz to the Bonesteel bank, and by said bank credited to the "Schultz Land Account," was a special deposit for the purpose of paying off outstanding incumbrances against the land purchased by Schultz. That the Bonesteel bank, on October 26, 1925, could and would have paid Criss the sum of $4,852.22 in cash had he demanded, but that he stated he would take a cashier's check. That thereupon Hogue, cashier of the Bonesteel bank, drew a check on said bank for the amount in question against the "Schultz Land Account" with which check he purchased and delivered to Criss the cashier's check of the bank. That the Bonesteel bank was a going bank and open for business at all times from October 26 to and including November 3, but that the cashier's check was not presented for payment until November 4. That there was at all times daily mail service between Bonesteel and Stuart, Neb., between Stuart, Neb., and Omaha, Neb., and between Omaha, Neb., and Bonesteel. Upon these findings the court made and filed its conclusions of law in part as follows. "From the foregoing findings of fact the court concludes as a matter of law, that the said sum of $6,525.00 paid by the defendant herein to the Citizens Bank of Bonesteel, South Dakota, and by that bank placed in an account denominated 'Schultz Land Account' was a special deposit with said bank for the sole purpose of said bank paying off the obligations and liens against the real estate described in paragraph two of said findings of fact; and that the plaintiffs are estopped by the act of their agent in taking the said Cashier's check and by his negligence in not promptly presenting the same for payment from proceeding against the premises involved in this action to collect or foreclose the said plaintiffs' mortgage; and are not entitled to the relief demanded in the complaint herein, and that said complaint should be dismissed upon the merits." And

thereafter entered judgment dismissing the complaint of plaintiffs upon the merits and quieting title in defendant pursuant to his counterclaim, from which judgment and a denial of their motion for new trial plaintiffs have now appealed.

It is established law in this state that, if a judgment arrives at the correct result upon the record and no prejudicial error appears, the judgment will be affirmed, even though it may have been reached upon incorrect reasoning or untenable theories. In re Yankton-Clay County Drainage Ditch, 38 S. D. 168, 160 N. W. 732; McDowell v. Jameson, 44 S. D. 480, 184 N. W. 251; Plucker v. C. M. St. P. Ry., 48 S. D. 185, 203 N. W. 208; Security State Bank v. Sykora, 51 S. D. 407, 214 N. W. 809; Keith v. Schievelbein, 53 S. D. 421, 220 N. W. 858; Corsica State Bank v. Heezen, 54 S. D. 113, 222 N. W. 671.

In this case, as doubtless in most others, a careful analysis of the fact situation may much assist in ascertaining the controlling legal principles and determining the proper application thereof.

On September 5, 1925, the Bonesteel bank had acquired from the fee owner of the premises in question a duly executed warranty deed thereto, grantee not named, with legal authority to insert as grantee the name of any person to whom the bank might convey the land. There were three mortgages of record against the land: A first mortgage to Federal Land Bank with some delinquent interest; a second mortgage originally executed to Eggenberger (which had subsequently come into the ownership of Brockman); and a third mortgage to Bonesteel bank. It is apparent that on or before that date some sort of an agreement had been made between the Bonesteel bank and Schultz whereby Schultz agreed to buy for the sum of $6,525, and the bank agreed to sell, marketable title to the premises in question, subject only to the lien of the first mortgage to the Federal Land Bank and interest thereon from date. As evidence of such agreement there was executed on September 5, by the Bonesteel bank, the instrument denominated and frequently referred to in the record as a "contract." This document starts out in the customary form of a bilateral contract as follows: "This Contract made this 5th day of September, A. D., 1925 by and between the Citizens Bank of Bonsteel, S. D. by L. B. Hogue, its Cashier, and Frank Schultz of Bonesteel, S. D. party of the second part: Witnesseth. * * *"

From that point on, however, the instrument becomes unilateral. It is executed by the bank only and is not signed and does not purport to be signed by Schultz, notwithstanding the fact that he was mentioned in the preliminary clause as "party of the second part." By that instrument the bank acknowledges receipt from Schultz of $6,525 "in payment," and the instrument recites that, in consideration for that payment (already made and receipt thereof acknowledged), the bank agrees to deliver to Schultz good marketable title to the premises 'in question, subject only to the lien of the first mortgage to the Federal Land Bank, with interest thereon paid up to September 1, 1925.

As a matter of fact, the actual payment of $6,525 by Schultz to the bank was completed by the cashing of Schultz's check two days later on September 7, and upon receiving that money the bank filled in the name of Schultz, as grantee in the Schwaller deed, and recorded the deed, and also satisfied of record the third mortgage held by the Bonesteel bank, and paid the past-due interest on the Federal Land bank loan.

In other words, on September 7 the bank partially performed its written promise to Schultz for the complete performance of which the bank was fully paid in advance.

 The payment of $6,525 by Schultz to the Bonesteel bank was not a "special deposit" by Schultz, nor was it in fact a deposit at all. The method adopted by Schultz in paying the Bonesteel bank $6,525 was to give to that bank his check to its order drawn against his account in another bank (the Dakota State) in the same town. This check was duly presented by the payee, paid by the drawee, and charged against Schultz's account with the drawee. Manifestly, this was not a deposit by Schultz in the Bonesteel bank, but was merely payment by Schultz to the Bonesteel bank of the full money consideration which he had agreed to pay, and in return for which he showed himself willing to take the bank's written promise to do certain acts, which promise as yet was but partially performed. In other words, he was willing to pay full consideration on his part at a stage of the proceedings when the bank had but partially performed and to rely upon the bank's written promise of further performance on its part.

True, the Bonesteel bank, after cashing the check of Schultz

for $6,525, in order, as the cashier said, "to keep a record of the transaction," credited the proceeds of that check on their books to what they denominated "Schultz Land Account." That, however, was the account of the bank and not the account of Schultz. It does not appear that Schultz even knew of it. Schultz had no control or dominion over the so-called "Schultz Land Account." He could not draw checks against it and had nothing to do with it. That account was created by the bank for the convenience of the bank, and all checks against it were drawn and signed by the officers of the bank. The establishing of the "Schultz Land Account" was nothing but a bookkeeping device adopted by the bank to keep track of money which Schultz had paid to it as the full consideration 'for its written promise to furnish him good title to certain realty. Whether in equity the situation between Schultz and the Bonesteel bank was such that Schultz might be entitled (as against the bank or creditors of the bank) to have this money which he had paid to the bank applied by the bank to the performance of its contract agreement with him, for which agreement the money constituted the consideration, is a question which is entirely immaterial to the decision of this case.

It is also plain upon the record here that the bank in endeavoring to secure a satisfaction of the second mortgage owned by Brockman was not in any sense an agent or representative of Schultz. The bank was under a contract obligation to Schultz to clear the premises from the lien of that mortgage, and Schultz had paid in advance the full agreed consideration for the making of that promise by the bank. If the bank failed to clear the premises from the Brockman mortgage, it would undoubtedly be liable to Schultz for breach of its contract, but it was in no sense his agent.

The situation from this angle on September 7 was this: Schultz was the fee owner, both in fact and of record, of the premises in question. Brockman held a second mortgage thereon. The Bonesteel bank, a third party, was legally bound to Schultz by virtue of written contract to procure the release of the Brockman mortgage. In procuring or attempting to procure that release, the bank (fully paid in advance by Schultz for its promise so to do) was acting independently and in performance of its contract and not as agent of Schultz.

■ Let us now consider the position of Brockman in respect to the transaction in question. He had come to be the owner of a note given by Lizzie Schwaller (formerly Lizzie Schmitz) and another to one Eggenberger, together with a mortgage securing the same upon the realty now owned by Schultz. Schultz had not assumed the note and was not personally obligated to pay it. Strictly speaking, the only personal liability to which Brockman could look was that of the original notemakers. However, the mortgaged land now owned by Schultz was the primary fund for the payment of the debt due Brockman. As a matter of fact, Schultz, in respect and to the extent of the value of land owned by him, while not strictly speaking a debtor at all, was for all practical purposes, contradictory as it may sound, a principal debtor. That is to say, while Schultz was not personally a debtor, nevertheless the land which he owned and for which he had fully paid was in substance the primary debtor. To speak of land as a "debtor" is of course anomalous, but we think the phrase makes our meaning clear. The situation was plainly pointed out in Murray v. Marshall, 94 N. Y. 611, quoted by this court with approval in Zastrow v. Knight, 56 S.D. 554, 229 N.W. 925, at page 931, 72 A.L. R. 379, as follows: "We cannot accurately denominate the grantee a principal debtor, since he owes no debt, and is not personally a debtor at all, and yet, since the land is the primary fund for the payment of the debt, and so his property stands specifically liable to the extent of its value in exoneration of the bond, it is not inaccurate to say that as grantee, and in respect to the land, and to the extent of its value, he stands in the relation of a principal debtor, and to the same extent the grantor has the equities of a surety."

■ Regardless of any question as to Brockman's constructive notice of the recorded deed to Schultz, and assuming that Brockman did not know whether or not the Bonesteel bank owned the land and did not know, constructively or otherwise, who did own it, Brockman, in dealing with the Bonesteel bank with reference to the satisfaction of his mortgage, is chargeable with knowledge that other interests were and might be involved in the transaction. Certainly Brockman knew that mortgagors were necessarily involved. Certainly Brockman knew that, if the Bonesteel bank did not happen to own the land which was a primary fund for the payment of

the mortgage debt, then the landowner, whoever he might be, had a very important interest in the situation.

■ Under these circumstances, Brockman delivered to Bonesteel bank a satisfaction of his mortgage and accepted as payment of his mortgage debt (whether absolute or conditional payment we will discuss later) a cashier's check issued and delivered to him by the Bonesteel bank. We realize that this proceeding was not handled by Brockman personally, but by his agent Criss. Nice questions, as a matter of the law of agency, might have been urged concerning the authority, actual or ostensible, of Criss to bind his principal, under the circumstances of this case, by taking a cashier's check. But by the allegations of their complaint appellants have seen fit to approve and ratify (for all the purposes of this case at least) the conduct of the agent Criss, and have made such conduct their own (or rather that of their predecessor in interest, Brockman), for they plead specifically that the Bonesteel bank "caused to be executed and delivered to the said Henry Brockman, who was the owner of said note and mortgage, a cashier's check on the said Citizens Bank of Bonesteel, South Dakota, for $4852.22 drawn by the said bank and payable by the said bank to the order of the First National Bank of Stuart, Nebraska." Having thus pleaded, appellants stand in the same position as though Brockman himself had personally conducted the transactions which were carried on by his agent Criss.

■ ■ We say, therefore (for the purposes of this case) that Brockman received the cashier's check at Bonesteel on Monday, October 26, 1925. It was presented for payment November 4, 1925, a week from the following Wednesday. To and including November 3, 1925, the Bonesteel bank was open and doing business. The inference is (rebuttable, of course, by proving the facts to be otherwise) that a bank open and doing business can and will honor lawful demands against it upon presentation. Green v. Schmitt, 57 S. D. 1, 230 N. W. 233. No evidence was offered in this case to rebut that inference. It must therefore be assumed that, if Brockman had presented his cashier's check to the Bonesteel bank at any time on or before November 3, it would have been honored and paid, and he would have received his money. We have stated that the cashier's check was not presented for payment until November 4, 1925, and the trial court specifically so found.

That finding is challenged by appellants. Hogue, cashier of the Bonesteel bank, testified that the bank transacted business as usual on Monday, November 2. That the bank was open on Tuesday, November 3, but did not accept deposits that day because of unsettled conditions. That offered deposits were "simply laid on the table." That the bank did not open for business on Wednesday, November 4, but was taken in charge by an examiner acting for the state superintendent of banks, who protested the cashier's check in question. That the cashier's check in question was sent to the Bonesteel bank through the Omaha National Bank. That he could not say whether the cashier's check was received before the bank closed or not. That he could not say on what date it came to Bonesteel. Upon this testimony appellants question the validity of the finding above mentioned. However, prior to the introduction of any testimony, counsel entered into a written stipulation regarding material facts and made the same a part of the record, a portion of which stipulation is as follows: "It is further stipulated that the Cashier's check mentioned in the amended complaint in this action for $4,852.22 was deposited in the First National Bank of Stuart, Nebraska, and thereafter was sent to its correspondent, The Omaha National Bank of Omaha, Nebraska, for collection and that thereafter the said Omaha National Bank of Omaha, Nebraska, presented said check for payment on November 4, 1925, to the Citizens Bank of Bonesteel, and said check was not paid and was duly protested for nonpayment on November 4, 1925, and at the time said check was so presented to the Citizens Bank, said bank had closed its doors and was at that time insolvent and in the hands of the Superintendent of Banks of the State of South Dakota for liquidation and said check has never been paid by said bank."

The only presentation of the cashier's check that could be material to the issues in this case was the first and earliest presentation thereof for payment. If the stipulation above quoted means anything, it means that the cashier's check was presented for payment on November 4, and not at any earlier date. The testimony of Hogue above alluded to is not contradictory of the stipulation. Hogue does not undertake to say that the cashier's check was presented prior to November 4. He merely states that he does not know when it was presented. No effort was made after the testi-

mony of Hogue was received, or at any time, to be relieved from the effect of the formal stipulation as to the check. The learned trial judge was therefore entirely right in basing his finding upon the stipulation and in finding that presentation for payment was made November 4, and not before.

The record shows that the normal course of clearance of bank items between Stuart, Neb., Brockman's home, and Bonesteel was by way of Omaha, and that there was daily communication by United States mail between Bonesteel and Stuart, Stuart and Omaha, and Omaha and Bonesteel. The cashier's check was in fact cleared through Omaha. The check was presented nine days after issue. The prima facie case made out by the record, and not in any manner contradicted, is that the check would have been paid if presented at any time prior to and perhaps even on November 3, eight days after issue. If Brockman was under any duty of prompt presentation (which we will hereinafter consider), it is clear that the trial court was justified in finding, under the circumstances here appearing, that he was negligent in that regard, and that such negligence was, at least prima facie, the cause of non-payment.

Since we must hold upon this record that Brockman was negligent, if he was under any duty of prompt presentation, it becomes unnecessary to decide whether the cashier's check of the Bonesteel bank was accepted by Brockman as absolute payment of his mortgage debt or as conditional payment thereof. Manifestly, it was one or the other. Of course, if the cashier's check was accepted as absolute payment, then the mortgage debt was eo instanti discharged and appellants could not possibly recover in this case.

Let us assume, then, the alternative, that the cashier's check was accepted as conditional payment only. We need not discuss or determine in this case the precise nature of the instrument commonly known as a cashier's check, nor the details wherein it may be similar to or distinguishable from other negotiable instruments. Cf. Uniform Laws Ann., vol. 5, p. 694. This much is plain beyond question. When an individual deals directly with a bank and takes the cashier's check of that bank, no orders upon or promises of a third party for payment are involved. He has received simply the bank's own order upon itself to pay money on demand. Section 1888, Rev. Code 1919 (section 186, Negotiable

Instruments Law) providing that a check must be presented for payment within a reasonable time after issue, else the drawer will be discharged from liability to the extent of the loss caused by the delay, has no application. As between the bank which issued the cashier's check and the man to whom it issued it, there is no obligation to present within a reasonable time, and the issuing bank cannot be discharged from liability, so far as it is concerned, by delay in presentment, even if negligent, any more than the maker of a promissory note can be discharged by failure promptly to demand payment when due. So far as the issuing bank is concerned, the cashier's check is, in substance, its written promise to pay on demand. See sections 1774, 1775, Rev. Code 1919 (sections 70 and 71, Negotiable Instruments Law). There being no parties chargeable on the cashier's check, save only the bank of issue, it is apparent, so far as the bank of issue was concerned, and so far as any situation arising out of the instrument itself, and so far as concerns the provisions of the Negotiable Instruments Law, that Brockman was under no duty of prompt presentation.

 Under the circumstances of the instant case, however, we are convinced that Brockman, accepting the cashier's check of Bonesteel bank as conditional payment of his mortgage debt, was under a duty of prompt presentation, not to the bank, but to others. The duty arose, not from the form of the instrument nor from the Negotiable Instruments Law, but because of the equities of the situation, and is bottomed upon the fact that we have previously pointed out; that Brockman, when he dealt with the Bonesteel bank concerning his mortgage debt, knew that some other interests were necessarily involved (at least those of original mortgagors), and that various other interests might be involved, that is, the interests of the landowner, if ownership was in some one other than the bank, and very possibly the interests of the intervening grantors and grantees, if any, in the chain of title whatever it might be between the original mortgagors and the present land owners. It is clear law that, if a creditor accepts from his debtor as conditional payment of the debt the written promise to pay of a third person, the creditor is bound to use ordinary means and reasonable diligence to collect and realize upon such promise to pay, and, if the creditor is guilty of laches in that respect and the debtor is thereby prejudiced, then the debt is satisfied to the extent of the face value of

the conditionally accepted promise of the third person or at least to the extent of the prejudice of the debtor. Kraetsch v. Chicago, 198 Ill. App. 395; Brown v. Spiegel, 156 Mich. 138, 120 N. W. 579; Wright v. First Crockery Ware Co., 1 N. H. 281, 8 Am. Dec. 68; Shipman v. Cook, 16 N. J. Eq. 251; Freeholders v. Thomas, 20 N. J. Eq. 39; Smith v. Miller, 43 N. Y. 171, 3 Am. Rep. 690; Phoenix Ins. Co. v. Allen, 11 Mich. 501, 83 Am. Dec. 756; Cochran v. Wheeler, 7 N. H. 202, 26 Am. Dec. 732.

In the instant case, if Brockman had dealt directly with Schultz, the landowner, and if Schultz had gone to the Bonesteel bank and purchased and paid full value for the cashier's check of that bank. payable to the order of Brockman, and handed the same to Brockman in conditional payment of the mortgage debt, it is plain that Brockman would be under a duty to Schultz to proceed with due diligence to realize on the cashier's check, and Brockman's negligence in that respect would be at his own peril. This duty would arise, not because Schultz was in any manner a party to the cashier's check as a written instrument, for on the assumed facts he would not be, nor because of the Negotiable Instruments Law, but because of the prevailing equities, and those equities are in no manner changed (under the circumstances of this case) by reason of the fact that Brockman received the cashier's check of Bonesteel bank, not from Schultz, but from the bank itself. Nor is it material that Brockman may not even have known of the existence of Shultz. When Brockman dealt with the Bonesteel bank and accepted its cashier's check as conditional payment of his mortgage, he knew that some other interests were involved and several other interests might be involved, and it was his duty in equity for the protection of such interests (whether specifically known to him or not) to proceed with diligence to collect the cashier's check.

In this case, assuming the cashier's check to have been conditional payment only, the fact remains that, so far as Schultz is concerned, by reason of Brockman's negligence, a debt for which the land of Schultz was primarily liable has not been paid, and the contract obligation of the bank with Schultz to pay said debt for which Schultz paid full consideration has not been performed. The prejudice to Schultz is apparent. By the negligence of Brockman, Schultz has failed to receive the thing for which he paid out

his money, to-wit, the discharge of a mortgage debt against his land by the Bonesteel bank.

It is therefore apparent upon this record that, whether Brockman took the cashier's check of Bonesteel bank as absolute payment or conditional payment, his successors in interest ought not now to be permitted to revoke or rescind the satisfaction of the mortgage or to enforce the mortgage debt against the land of Schultz. The judgment denying the relief asked by plaintiffs appellants and quieting title in Schultz as against any claim of lien upon their part is therefore the only judgment which this record would support. No prejudicial error appearing, the judgment and order denying new trial must be, and they are, affirmed.

POLLEY, ROBERTS, WARREN, and RUDOLPH, JJ., concur.