Argued January 8; modified April 23; rehearing denied
June 11, 1946

# FIRST NATIONAL BANK OF PORTLAND
## v. NOBLE and THE UNITED STATES
## NATIONAL BANK OF PORTLAND
(168 P. (2d) 354)

Martin W. Hawkins, Judge.

H. B. Beckett, of Portland (Wilbur, Beckett, Oppenheimer, Mautz & Souther, and R. K. Powell, all of Portland, on brief), for appellants.

R. R. Bullivant, of Portland (Pendergrass, Spackman & Bullivant, and C. E. Wright, all of Portland, on brief), for respondent First National Bank of Portland.

· Wilber Henderson, of Portland (Platt, Henderson, Warner, Cram & Dickinson, of Portland, on brief), for respondent United States National Bank of Portland.

BRAND, J.

The plaintiff First National Bank of Portland (Oregon) instituted this proceeding as an action in assumpsit against the defendants Lillian S. Noble and John C. Noble and the United States National Bank of Portland (Oregon). Plaintiff seeks restitution in the sum of $10,573.50, the amount of a cashier's check issued by the First National to the U. S. National. The U. S. National filed a bill in interpleader alleging that it was disinterested as between the parties and tendering the money into court. The interpleader was allowed and an order entered discharging the U. S. National of all liability. By assent of the parties, the case was tried below as a suit in equity. The

plaintiff prevailed against the defendants Noble who appeal.

BRAND, J.

The facts are as follows: John C. and Lillian S. Noble had purchased certain property from T. D. Lee through Kelleck, a broker. Subsequently by written agreement the sale was rescinded. In accordance with the agreement, the property was reconveyed. Mrs. Noble paid T. D. Lee $693.49 in adjustment of items which had arisen while the Nobles were in possession of the property and before the rescission; and E. C. Kelleck, who did business as the West Coast Brokerage Company, on September 21 drew and issued a check for $10,573.50 on the drawee First National Bank, payable to Lillian S. Noble to whom it was delivered. The Nobles received the Kelleck check in good faith and for value. Before noon of the same day, Mrs. Noble indorsed the check in blank and deposited it in the U. S. National Bank. Twenty-five hundred dollars was deposited in their joint checking account, the balance in their joint savings account. These deposits appear as credits to the Nobles in the ledger and savings pass book, respectively, under date of September 21.

The rules printed in the savings pass book and on the commercial deposit slip were substantially the same. They provide that checks and drafts are credited conditionally—may be charged back "if not found good"—and that the bank will be liable only where actual funds or solvent credits come into its possession.

On September 21 the U. S. National placed its clearing house indorsement on the back of the Kelleck check, but according to custom the stamp was dated

September 22, the day for final settlement through the clearing house. The Kelleck check reached the First National on September 22. Reference to the Kelleck account disclosed that he had a credit of only $200. The check, therefore, was referred to Mr. T. D. Peters, assistant cashier of the First National. Peters placed on the lower left hand corner of the face of the check a small symbol, the meaning of which was known only to himself and to certain persons in the bookkeeping department and which indicated that the check was to be rejected for want of sufficient funds. The First National's bookkeeping department then sent the check back through the clearing house to the U. S. National with advice to the effect that it was rejected because of insufficient funds in the Kelleck account. On receipt of the rejected check, the U. S. National mailed to Mrs. Noble at her home address, Oswego, Oregon, advice dated September 23 informing her that the Kelleck check was "being held" because N. S. F. and that the amount was being charged to the Nobles' savings account. The Nobles had left for California at 8:00 a. m. on September 22 and did not receive the notice until their return in October.

When the Kelleck check first went through the clearing house, the U. S. National received a credit against the First National. When the Kelleck check was sent back to the U. S. National through the clearing house, the credit to the U. S. National was cancelled. The Kelleck check was returned to the U. S. National prior to 11:00 a. m. on September 23. The bank then placed upon the check its stamp cancelling the clearing house indorsement previously placed thereon. On Friday, September 24, shortly before 3:00 p. m., the U. S. National presented the check by messenger to the Collection and Exchange Department

of the First National. This was done because the U. S. National desired final payment. Mr. Bohlman, a teller in that department, observed from the condition thereof that the check had previously been rejected. He also observed the symbol which Mr. Peters of the First National had placed on the face of the check. Bohlman mistook the rejection symbol, which he had never seen before, for a symbol authorizing payment. Acting upon his mistaken assumption, he prepared a cashier's check dated September 24, payable to the U. S. National in the amount of the Kelleck check. The First National placed upon the back of the Kelleck check a stamp as follows:

Paid Through Clearing House

Pay to the Order of

Any Bank, Banker or Trust Co.

Sep 25 '43 9900

Prior Endorsements Guaranteed

The First National Bank of Portland

24-4      Portland, Oregon      24-4

At the same time that Bohlman prepared the cashier's check, he also prepared a blank entitled "Application for Exchange." That instrument is dated September 24, 1943. Upon the face of the application, the following appears:

Cashier's Check ☑

Funds Received
Check on 24-4
Order of 24-11
Purchased by 24-11
534796
Total 10,573.50

24-11 is the number of the U. S. National. 24-4 is the number of the First National. 534796 is the num-

ber of the cashier's check which Bohlman prepared. The application for exchange is initialed by Bohlman and was signed by Margaret Berhorst, the messenger of the U. S. National. In pencil and written across the face of the application for exchange are the words "Check has been paid." The application for exchange also bears a stamp: "10 1st of P 56" and underneath "111." The testimony indicates that the words "Check has been paid" were not placed on the application for exchange by Bohlman, but by some other person in the First National Bank at a later time. Bohlman then delivered the cashier's check, together with the Kelleck check to Metschan, pro-assistant cashier of the First National, who signed the cashier's check. At the request of Bohlman, the messenger of the U. S. National placed upon the Kelleck check the stamp of the U. S. National which reads:

"United States National Bank
PAID
12
Portland, Oregon"

The cashier's check was then delivered to the messenger who returned with it to the U. S. National. On its back it bears the indorsement "Credited to account of Mrs. John C. Noble, The United States National Bank, Portland, Oregon," and also the clearing house stamp of the U. S. National which reads "Pay through Clearing House. 11 Sept. 25, 1943." The check is perforated:

"24 PD 4
9 24 43."

The perforation by the First National occurred after the cashier's check had been returned by the U. S. National to the First National. The First National

retained the Kelleck check. The U. S. National under date of September 24 mailed to Mrs. Noble at her Oswego address an advice of credit which contains provisions on its face similar to those on the deposit slips and savings pass book already mentioned.

On Saturday, September 25, the Kelleck check, which had been left with Bohlman of the First National, reached the bookkeeping department of that bank. It was tendered with other rejected items to the U. S. National which refused to take it. Shortly after 12:00 o'clock noon of that day, Mr. Moore of the First National learned of the refusal of the U. S. National to receive the Kelleck check and of the issuance of the cashier's check and that it had been presented for collection through the clearing house at 8:45 a. m., September 25.

There is some question as to when the cashier's check actually first reached the First National Bank; but the testimony of Charles W. McCarty, manager of the Savings Department of the U. S. National, indicates that the check actually left the U. S. National on the 24th and that it is the practice for the clearing house stamp to bear the date of the following day. It will also be recalled that the perforation placed upon the cashier's check, indicating that it had been paid, bears date of September 24. It was believed by one witness, Moore of the First National, that the perforation date as of September 24 was in error, and that it was in fact perforated on September 25. Other testimony indicates that the cashier's check probably did not physically go through the hands of the clearing house but was delivered directly to the First National on September 24. The lists of checks which were directly exchanged by the banks did, however, go to the clearing house, and the settle-

ments were made at 8:45 a. m., September 25, just as if the checks had been physically presented through the clearing house. We think it likely, therefore, that the cashier's check was received by the First National on September 24 and was perforated "paid" on that date, though the clearing house transaction took place the next morning.

Upon his discovery of the issuance of the cashier's check, Mr. Moore immediately called Kelleck, who stated that he would make a deposit on Monday, the 27th, to cover the Kelleck check. Moore then called the U. S. National by telephone and informed Charles Winkel, the chief clerk, of the situation. Winkel refused "to accept the check back as a returned item" but agreed to "flag" the Noble account.

On Monday, September 27th, Kelleck called Mr. Moore at the First National and stated his inability to cover his check at that time and that the matter could not be cleared up until the return of the Nobles from California. On the same day Mr. Moore and Mr. Bohlman called on Mr. Arnold at the U. S. National. Arnold informed them they could not again charge the Nobles' account because they did not have the Nobles' permission to do so. The First National demanded a refund of the cashier's check. Arnold of the U. S. National explained to Moore of the First National that, since they had received the cashier's check in payment of the item on Friday afternoon, he did not want to refund it without referring to the bank's attorneys. On September 28 the U. S. National advised the First National that the matter was being so referred.

Two other exhibits require comment at this point. The First National Bank's ledger sheet of the West Coast Brokerage Company (Kelleck) shows a balance on September 21, 1943, of $1,000; on September 22,

1943, after a withdrawal of $800, a balance of $200. Opposite date of September 24, 1943, there appears an entry in red ink, "$10,373.50, O. D." There is also in evidence a copy of an advice of charge, the original of which was sent to West Coast Brokerage Company. It reads in part "This is to advise you that we have this day charged your account in this bank $10,573.50 as follows: Check No. 2528, dated 9-21-43 to Lillian S. Noble paid by mistake." It is dated "9-24-1943."

It appears from the testimony of Mr. Zollinger, vice-president of the First National, that neither the entry of overdraft nor the advice of charge was made out on September 24 as dated. For reasons later explained both instruments were prepared some time after October 18, but were dated September 24 as indicated on the exhibits. The Kelleck check now stands as an overdraft on the books of the First National.

We will first consider whether, as claimed by the defendants, issuance and delivery by the First National of its cashier's check constituted, under the circumstances, unconditional payment of the Kelleck check.

■ The complaint states a purported cause of action in assumpsit on the theory that money was actually paid to the defendants by mistake. It recites that the payment was made under mistake of fact, and that plaintiff requested a refund of said sum. After the filing of the bill of interpleader, the plaintiff filed a reply and "amended counterclaim against the defendants and appellants, Lillian S. and John C. Noble," wherein it seeks to modify the theory by alleging that the U. S. National received a "provisional credit" in the amount of the cashier's check and gave the Nobles a "provisional credit" therefor. But in the

so-called reply and counterclaim, the plaintiff alleges that the U. S. National presented the Kelleck check as a "collection item" and the cashier's check was given in exchange therefor and that the First National demanded "a refund of the cashier's check," and prays for judgment in the alternative against the fund in the custody of the court or against defendants. Counsel for the plaintiff asserts that the initial proceedings were superseded by the reply and counterclaim. But a reply does not supersede a complaint, and counterclaims are pleas of defendants and not of plaintiffs. The original complaint was introduced in evidence, but its introduction was unnecessary for it remained as an operative pleading throughout the trial and is of some significance in ascertaining the actual understanding of the plaintiff as to the nature of the transaction, notwithstanding the shift in theory which appears in the reply. Furthermore, in an action in assumpsit for money had and received, it appears to be essential that the plaintiff should show that the defendant received either money or something which was treated by the parties as money.

In *Wagener v. United States National Bank,* the defendant issued a check on a drawee bank, payable to the defendant bank in payment of a debt of 67¢. Owing to the form in which the check was drawn, the defendant bank received credit in the amount of $67 through a clearing transaction between the defendant and the drawee bank. The plaintiff sued to recover the amount in which the check exceeded the amount of the debt. This court said:

> "We think, however, it is not necessary for the plaintiff to show that the money to which he had title, like he had to his horse or his cow, was received by the defendant to sustain this cause of

action. It is sufficient if he show that by any process, which was treated by the parties as a money transaction, the defendant has received money or its equivalent which, in equity and good conscience, belongs to and should be paid to the plaintiff * * *." *Wagener v. United States Nat. Bank,* 63 Or. 299, 302, 127 P. 778, 42 L. R. A. (N. S.) 1135.

■ When a debtor gives his own check or promissory note to a creditor, prima facie the transaction is conditional payment only. But even in such a case the ultimate question is one of intention of the parties to the transaction. *Smith v. Mills,* 112 Or. 496, 503, 230 P. 350. The mutual intention of the parties that a check shall be given and received as payment may be established by proof either of an express contract or a contract implied in fact. *Joppa v. Clark Commission Co.,* 132 Or. 21, 28, 281 P. 834; *Riner v. Southwestern Surety Ins. Co.,* 85 Or. 293, 300, 165 P. 684, 166 P. 952; 48 C. J., Payment § 51, p. 619. If the check of a debtor may, when so understood, constitute payment, a stronger case for final payment would be made out where the debtor's check is presented to the drawee bank and exchanged for the cashier's check of the drawee bank, the original check being marked paid and surrendered. This is especially true in view of the fact that cashier's checks ordinarily pass current as money in everyday business transactions, *Riverside Bank v. First Nat. Bank,* 74 Fed. 276; *Johnson v. First State Bank,* 144 Minn. 363, 175 N. W. 612, 9 A.L.R. 960; *Wachtel v. Rosen,* 249 N. Y. 386, 164 N. E. 326, 62 A. L. R. 374; 7 Am. Jur., Banks § 525, p. 379; see *Merchants' Bank v. State Bank,* 10 Wall. 604, 19 L. Ed. 1008; *First Nat. Bank v. Commercial Bank & Trust Co.,* 137 Wash. 335, 242 P. 356; and in view of the further fact that the right of countermand applied to ordinary

checks does not exist as to a cashier's check. *Pines v. United States*, C. C. A. 8th, 123 F (2d) 825; *Polotsky v. Artisans Savings Bank*, 37 Del. 151, 188 Atl. 63, 107 A. L. R. 1458.

The following is a brief summation of the evidence tending to indicate that the cashier's check in the case at bar was given, received and dealt with by the parties as final payment.

The application for exchange, prepared by the First National and signed by the messenger of the U. S. National under date of September 24, shows the cashier's check to be "purchased" by the U. S. National. The Kelleck check on the First National records appears as "funds received." Some representative of the First National wrote on the application "Check has been paid." The First National required the messenger of the U. S. National to stamp the Kelleck check paid. The cashier's check of the First National bears its perforation "24 PD 4 9-24-43." The cashier's check was endorsed by the U. S. National "credited to the account of Mrs. John C. Noble," and, according to the allegations of plaintiff's complaint, still remains a credit to her account, which is admitted by the Nobles. In October the First National entered in red ink on Kelleck's ledger sheet under date of September 24, the amount of the Kelleck check, and the letters "O. D." meaning overdraft, and sent Kelleck a notice of charge to the same effect and bearing the same date.

Arnold of the U. S. National testified that the direct presentation by messenger was made "because the bank was anxious of securing a final payment." On September 27 Mr. Zollinger, vice-president of the

First National, wrote a letter to the U. S. National in which he said:

"On September 22, you presented for payment a check drawn on us by West Coast Brokerage Company payable to Lillian S. Noble and endorsed by her and by you. This check was dishonored when presented for want of sufficient funds.

"On September 24, check was again presented and on this occasion it was honored by mistake and we issued our cashier's check No. 534796 in the amount of $10,573.50 in payment. Our cashier's check bears your endorsement 'credited to account of Mrs. John C. Noble.' "

Concerning a telephone conversation with Moore of the First National on September 25, Winkel, the chief clerk of the U. S. National, testified as follows:

"He informed me that they had issued a cashier's check in *payment of a check* of one of our depositors, and they had found out that there was not sufficient funds in their customer's account to cover the cashier's check for it. I knew nothing, of course, of the transaction at that time. My conversation with him was that inasmuch as they had issued a cashier's check, I would be unable to accept the check back as a returned item *because we considered that as final payment,* but I would flag the account * * *." (Italics ours.)

Concerning the red ink "O. D." entry on the Kelleck ledger sheet, Mr. Peters of the First National testified as follows:

"Q Mr. Peters, why would there be an entry in the ledger that there is an overdraft; what could have transpired to bring about an entry of that kind in the ledger?

"Q Let me put it to you direct: had the Bank paid out that amount of money?

"A Evidently so." * * *

"Q  Does that correctly reflect the records of the First National Bank, Mr. Peters?

"A  If this is the original, it does.

"Q  Your counsel has stated it is the original, I believe.  It has been produced here.

"A  That is all right."  *  *  *

"Q  Then if we assume it is the original ledger sheet of the First National Bank, then the First National Bank had paid out sufficient money to make an overdraft against this man's account in the amount of $10,373.50, is that correct?

"A  That is correct."  *  *  *

"Q  Mr. Peters, where you turn down a check for insufficient funds, as you did the Kelleck check, you send it back through the clearings, don't you?

"A  That is right.

"Q  And under those circumstances you don't charge the customer's account, do you?

"A  No, if it is charged back."  *  *  *

"Q  What is it?

"A  Not if it is returned.

"Q  Not if it is returned.  So that this charge against the customer's account here on this Exhibit 20 showing this overdraft of $10,373.50 was entered only after the First National Bank had issued its cashier's check in payment of the Kelleck check, isn't that correct.

"A  That is right."

Concerning the fact that the Kelleck check was presented by messenger, Mr. Bohlman of the First National testified:

"A  The only significance that I attached to that was that the U. S. National Bank was attempting to get payment of that item.

"Q  You understood then that was the purpose?

"A  They were making a further attempt to collect the money."

Moore of the First National, in explaining why the red ink entry was dated back, testified:

"It was dated back to September 24 to appear on our books as of the date the Kelleck check was actually paid."

The presentation of the cashier's check through the clearing house, according to witness Moore, resulted in a credit to the U. S. National and a debit to the clearing house balance of the First National, and that debit has never been restored or made good. Again Moore testified:

"Q And the purpose of presenting a check like this by messenger in banking circles is to get immediate payment, isn't it?
"A Yes.

"Q And immediate payment was made at the time the check was presented?
"A Yes.

"Q By the issuance of your cashier's check?
"A Payment was made by the cashier's check, yes."

Referring to the "paid" stamp which was placed on the Kelleck check by the messenger of the U. S. National, Moore testified:

"That is merely the stamp that is the messenger's receipt or clearance for the check. It is the U. S. National's receipt for the funds."

Concerning the cashier's check, Moore testified:

"Q And your cashier's check was paid by you and so stamped on the date of its issue, September 24th, was it not?
"A Yes, sir.

"Q What does it mean when you issue a cashier's check and when it comes back to you and you stamp it "paid", what does that mean?
"A It means merely that it is paid.

"Q Well, that is what I would think. There is no doubt in your mind but what that cashier's check was paid, is there?

"A No, the cashier's check was paid, but the consideration for it was found to be practically valueless, the consideration given in payment for it.

"Q That may be true, but your cashier's check was issued and paid by you?

"A That is true."

Again he testified:

"A I would say it is the practice and custom to accept cashier's checks in local banks very much the same as cash because of our confidence in the solvency of the bank, whether it is one in favor of us or whether we are cashing it for an individual.

"Q That is the general custom and practice in the community?

"A That is true."

Concerning the October entry of an overdraft as of September 24 on the Kelleck ledger, Zollinger of the First National testified:

"It seemed to me that the best way to take it out of suspense was to make a charge against the account by our form Miscellaneous 6, which is the advice of charge, showing on its face that the reason for the charge was a check drawn by the depositor and paid by mistake, and then to charge off the amount of that item, so that it would not appear in our financial statement that we were holding valid and collectible assets, undisputed assets which were represented by that balance."

The efforts of the First National to secure payment from Kelleck continued into October at which time Kelleck undertook to make payment in installments.

Concerning the issuance of the cashier's check, Zollinger testified as follows:

"Q For what purpose?

"A Application had been made for the issuance and delivery of the cashier's check, and as I view it, the Kelleck check was tendered in payment for the cashier's check as consideration for its issuance.

"Q And you issued a cashier's check in payment of the Kelleck check, didn't you?

"A Well, I am not going to testify to that effect, Mr. Beckett. I don't think that is the fact.

"Q Let me ask you this: suppose the Chase National Bank of New York is your correspondent and they send out a check to you here that is drawn on the U. S. National Bank for ten thousand dollars and ask you to present it to the United States National Bank for payment, and you send your messenger over to the United States National to their Collection Exchange Department and present it and the United States National Bank issues its cashier's check payable to the First National Bank of Portland (Oregon) and the Chase National Bank has asked you to communicate with them at once whether that check was paid. You would wire the Chase National Bank immediately upon that cashier's check being given to you that that item was paid, wouldn't you?

"A I think we would."

When asked if cashier's checks of solvent institutions are treated as cash, Zollinger testified that they were not always so treated and gave as an illustration the fact that when a cashier's check is lost another one is issued. He then testified as follows:

"Q All right. That is one thing. Where is another instance where it is not treated as currency?

"A Within the scope of my own experience

I don't think I can answer any other instance in which a different result flows because of the distinction." * * *

"Q All right. At the time you wrote that letter, which was September 30, six days after you had issued your cashier's check, you considered, did you not, that you had paid the money for the Kelleck check?

"A I think probably that I did.

"Q Yes. And when did it first occur to you that you had not paid it?

"A This distinction between a payment of the Kelleck check and the issuance of a cashier's check in consideration of the Kelleck check is one which I do not think was made for a substantial period after that, in my own thinking on the subject.

"Q In other words, as far as you were concerned, it was not until a considerable time after you wrote this letter that it occurred to you or was called to your attention that possibly there was not a payment of the Kelleck check, is that it?

"A That is correct."

Mr. Arnold of the U. S. National testified that his bank accepted the cashier's check as a solvent credit and also that the cashier's check was paid.

Arnold, on September 28, wrote Mrs. Noble in part as follows:

"* * * This cashier's check was paid, and the proceeds placed to your account. Immediately thereafter The First National Bank notified this bank that payment had been made by mistake, as there were insufficient funds in the account of West Coast Brokerage Company and E. Kelleck to pay that check, and this bank has now received from The First National Bank written demand for the return of this money on the ground that payment was made by mistake.

"Since the duties of this bank were completed upon receipt of the proceeds of this check, we are referring this matter to you for instructions."

On October 9, D. R. Smith, assistant cashier of the U. S. National, wrote Mrs. Noble:

"We regret that the neighboring bank has caused you any inconvenience on this transaction as the check was cleared through that institution *and credited in final payment to your savings here.*" (Italics ours.)

On cross examination Arnold testified:

"Q Well, you know more about the banking business than I do, so maybe I cannot express it as clearly as you think it should be expressed. But I can only say this, I would like you to assume hypothetically that his cashier's check had not resulted in any benefit or credit to the United States National Bank, but that it had first been placed to the credit of the Noble account in the manner in which you placed it to the credit of the Noble account, but that before you got any benefit from it in a Federal Reserve balance or otherwise, liability was repudiated by the First National Bank, such as, for example, that the signature of the signing officer had been forged, would you then have exercised any right to charge back the amount of the cashier's check to the Nobles' account, or would you have considered yourself absolutely liable to the Nobles?

"A * * * I think that the reason why we withheld charging the cashier's check was due to the fact that we had already run through our bank as an entry and had advised the Nobles of the credit of the cashier's check. I admit that my own feelings at the time were that the cashier's check was a final credit. I don't believe any of us felt at that time that the fact that it was being honored entered the picture at all."

The plaintiff relies strongly upon the printed provisions of the savings deposit slips employed by the U. S. National in crediting the Nobles account. They provided "All items are credited conditionally at the time of deposit  *  *  *  ." Under that provision the Kelleck check was credited conditionally on September 21. The next provision of the deposit slip reads as follows:

" *  *  *  And for the convenience of the depositor, the bank may accept from any drawee bank, or collecting agent an exchange draft, or credit therefor, as conditional payment in lieu of cash, and the bank will only be liable when the proceeds in actual funds or solvent credits, come into its possession.  *  *  *  The bank may charge back any item at any time before ultimate payment, whether returned or not  *  *  *  ."

If, when the Kelleck check was presented by the messenger, the U. S. National had accepted "an exchange draft or credit" from the First National, that too might have been conditional payment because the bank on which the exchange draft was drawn might have refused to honor it. But the cashier's check of the First National was not an exchange draft or credit within the meaning of the provision. It was the direct obligation of the First National. It was a solvent credit; and, when it came into the possession of the U. S. National as collecting agent, that bank became, under the express terms of the contract, "liable" to the Nobles. It could not charge the item back, for it had received "ultimate payment." *In re Bank of United States*, 243 App. Div. 287, 277 N. Y. Supp. 96; O. C. L. A. § 40-2209.

Part I, Section 2, of the Clearing House Rules provides:

"B. MESSENGERS' PAID STAMPS:

"The Paid Stamp used by messengers of Member Banks on items presented directly at the counters of Member Banks shall be construed to guarantee previous endorsements. Member Banks shall only make payment to such messengers for such items with their Cashiers check, unless endorsed by the autographic signature of an officer of the collecting bank."

■ Obviously this rule was adopted to avoid the inconvenience and risk involved in the physical transfer of currency from bank to bank. The rule contemplates that, when items are presented by messenger over the counter of a drawee bank, the collecting bank has an option to take cash or cashier's check, the option to take cash being manifested by an autographic signature. The existence of an option to accept either cash or cashier's check, coupled with an election to take the latter and accompanied by the surrender of the original item to the drawee bank, constitutes persuasive evidence of unconditional payment of the item. 40 Am. Jur., Payment § 80, p. 770. It may be that delivery to the messenger of a draft on another institution in exchange for the item might present a different question. But see *Johnson v. First State Bank*, supra.

Part I, Section 1, of the Clearing House Rules provides:

"RETURNED ITEMS:

"Dishonored items shall be returned to the Clearing House not later than 11:00 o'clock A. M., on the following business day, except that Cashier's checks, certified checks, and items drawn by other

banks; (a) on a drawee member, or (b) marked "Payable if Desired" at a drawee member, unpaid upon presentation, shall be returned to the clearing bank not later than 4:00 P. M. on the day on which they are presented."

Witness Moore of the First National testified that in view of the general practice to return dishonored items at 11:00 o'clock he could "assume" that the Kelleck check was returned to the U. S. National by 11:00 A. M. Saturday. But the Kelleck check was not either a returned item or a dishonored item. It had been honored by the First National. It bore their stamp "Paid through Clearing House * * * ," etc., under date of September 25, and the cashier's check had been issued in exchange for it.

Moore testified further:

"Q No, but the general practice and custom of the Clearing House banks is to run through clearings for recoupment only those items that have been presented through clearings. Now you are a banker. That is true, isn't it?

"A That is true. That is the general practice, but I don't believe the Clearing House Rules in so many words limit it or restrict it only to that.

"Q But that is the general practice?
"A That is the practice, yes, sir.

"Q That you all adhere to?
"A That is usual practice, I would say."

Moore later testified that errors of the kind involved "so seldom occur" that "I don't believe there is any practice."

Emmons of the First National testified:

"Q In making up the list of items for which you seek reclamation, do you ever present an item

through the Clearing House that was not paid through the Clearing House?

"A Well, ordinarily we don't because—

"Q (interrupting) What is it?

"A Ordinarily we don't. I don't remember of seeing an item so presented."

Witness Cochran of the Clearing House testified:

"Q In other words, there are many transactions that are handled direct by messenger between one bank and another?

"A Yes, sir.

"Q And transactions of that character are not embraced within the Clearing House Constitution or Rules?

"A I would say no."

Immediately thereafter, and expressing a somewhat different opinion, the witness said:

"In so far as the item received by the messenger and exchanged for a check, customer's check, then the item cleared through the Clearing House would be under the Clearing House Rules."

However, upon further examination the witness returned to his original opinion:

"Q Mr. Cochran, where one member bank sends a check by messenger to the Exchange Department of another member bank to effect collection of the check, is that governed by the Clearing House Rules and Constitution?

"A I don't believe so.

"Q What is it?

"A I don't think so; I don't believe so. It is a transaction between the two banks.

"Q It is a direct transaction, is it not, between the two institutions?

"A Yes, sir.

"Q Under the Rules of the Association and Constitution it provides for returned items, doesn't it?

"A Yes, sir.

"Q A returned item is one where one bank presents the item to another one and receives credit in the first instance through the Clearing House, isn't that true?

"A Yes, sir.

"Q And then the drawee bank upon examining the instrument after it has received it, for some reason, like insufficient funds or faulty signature or some reason of that sort, may wish to reject the item?

"A Yes, sir." * * *

"Q Yes. Mr. Cochran, take a case where a check is sent by one bank to another by messenger for collection and the bank to whom it is sent takes up the check and issues its cashier's check payable to the presenting bank, and the cashier's check is handed to the messenger—do you get that state of facts?

"A Yes, sir.

"Q Then that is a direct transaction between the two banks, isn't it?

"A Yes, sir.

"Q To which the Clearing House Rules or Constitution have no application, isn't that true?

"A To my knowledge, yes.

"Q To your best knowledge, yes?

"A Yes.

"Q All right. Under your Clearing House Rules, your Constitution, can the bank that took up the check and issued its cashier's check in payment, return the check,—not the cashier's check, but the check, back through the Clearing House mechanism to the bank that received the cashier's check?

"A As the Secretary of the Clearing House

Association I don't think that point is covered in the Constitution and the Rules.

"Q You have studied these Rules, I assume, with great care over a long period of time?

"A I have read them through, yes.

"Q From a general reading of the Rules do you see anything in them that would countenance or support the right of the bank that took up the check, to use the Clearing House mechanism for returning it, where the transaction originally was handled direct?

"A No, I haven't—

"Q (interrupting) What is it?

"A No sir." * * *

On further examination by the plaintiff, he testified:

"Q Yes. If the collecting bank elected to make use of the channels of the Clearing House for collection of the cashier's check, then that process would be subject to the rules of the Clearing House?

"A Yes, sir."

There was some inconsistency or vacillation in the testimony of witnesses Moore and Cochran, but they and all the other witnesses testified with great candor. There was no ground for impeachment and none was attempted. In the main the witnesses testified concerning the actual practice of and between the banks as we have above set forth. The minor discrepancies arose from answers skillfully elicited in support of a legal theory of conditional payment. The testimony as a whole supports the view that the clearing house rules did not apply to the Kelleck check when presented by messenger and that the cashier's check did constitute absolute payment. It was not in any sense a "dishonored" or "returned" item to which the rule in question could apply.

Article XIV, Section 2, of the Constitution of the Portland Clearing House provides in part as follows:

"Sec. 2. Errors in the exchanges and claims arising from the return of checks or from any other cause, are not to be adjusted through the Portland Branch of the Federal Reserve Bank but directly between the members who are the parties to them; all checks and drafts in the exchanges *not found good,* or missent, shall be returned without intentional mutilation, or notice of dishonor, directly to the member from whom they were received, and the said member shall immediately refund to the bank returning the same, the amount for which it has received credit through the Clearing Settlement for the said checks or drafts so returned to it * * * ." (Italics ours.)

The cashier's check issued by the First National Bank over the counter but sent through clearing for collection was not within the definition of a check or draft "not found good" within the meaning of the rule.

The clearing house rules must be construed in the light of the obvious reason for their existence. When a check on a drawee bank is presented through the clearing house for collection, as a matter of convenience credit is given to the presenting bank and the drawee bank is charged with the amount of the item. This occurs before the drawee has seen the instrument or has any knowledge concerning its validity, sufficiency or existence. The rules provide a period of grace so that before the credit and debit items become final, the drawee may examine the check, determine its genuineness and the sufficiency of the drawer's account; and, if it appears invalid or N. S. F., the bank may by acting promptly under the rules protect itself. But when an item is presented for

payment by messenger, the opportunity for full investigation precedes the extension of credit or the making of payment instead of following it as is the case of checks presented through the clearing house. There is no reason to construe the rules as giving a second chance to investigate before payment becomes final when the drawee has already had one full opportunity therefor.

■ We have concluded that the asserted right of the plaintiff to restitution must be considered exactly as if the Kelleck check had been paid over the counter in cash. Our conclusion is further supported by the following authorities. See 56 A. L. R. 532, 107 A. L. R. 1464.

> "Then, too, a banker's check is markedly distinguishable in its nature from a cashier's check to which in point of countermandability it was likened by the majority of the court in Kohler v. First National Bank of Tonasket, supra. A cashier's check is, as we understand the term, a check drawn by a bank upon itself to the order of the payee named therein. Such a check is denominated by the courts as being what in reason it is, a bill of exchange drawn by a bank upon itself and accepted in advance by the act of its issuance. Drinkall v. Movius State Bank, 11 N. D. 10, 88 N. W. 724, 57 L. R. A. 341, 95 Am. St. Rep. 693; Causey v. Eiland, supra. It therefore possesses none of the characteristics of a mere order to pay money. It is a primary obligation of the bank. Bank of Statham v. National Bank of Athens, 143 Ga. 293, 84 S. E. 966. It becomes the obligation of the issuing bank as much so as if the bank had given a promissory note instead of its check. Scott v. Seaboard Securities Co., 143 Wash. 514, 255 P. 660; Walker v. Sellers, 201 Ala. 189, 77 So. 715. The instrument, therefore, being one of primary obligation on the part of the bank, there can be no right of counter-

mand by it such as exists where the document constitutes a mere direction or order to pay. The difference is a most material one." *Polotsky v. Artisans Savings Bank,* supra.

*In re Bank of United States* presents a similar situation. In that case the drawer issued a check against his account in the Bank of the United States, making it payable to the order of the National City Bank, and he then deposited it with the latter bank. The payee bank presented the check *by messenger* to the drawee bank for payment and received a cashier's check for the amount. This was in accordance with usual banking practice designed to dispense with the unnecessary transportation of cash. Before the cashier's check was paid, the Bank of the United States was taken over by the superintendent of banks. The court said:

"A cashier's check issued by a bank, however, is not an ordinary draft. The latter is a bill of exchange payable on demand. It is an order upon a third party purporting to be drawn upon a deposit of funds. Drinkall v. Movius State Bank, 11 N. D. 10, 88 N. W. 724, 57 L. R. A. 341, 95 Am. St. Rep. 693; State v. Tyler County State Bank (Tex. Com. App.) 277 S. W. 625; 42 A. L. R. 1347. A cashier's check is of a very different character. It is the primary obligation of the bank which issues it (Nissenbaum v. State, 38 Ga. App. 253, 143 S. E. 776) and constitutes its written promise to pay upon demand (Steinmetz v. Schultz, 59 S. D. 603, 241 N. W. 734). It has been said that a cashier's check is a bill of exchange drawn by a bank upon itself, accepted in advance by the very act of issuance. Kohler v. First National Bank of Tonasket, 157 Wash. 417, 289 P. 47; Causey v. Eiland, 175 Ark. 929, 1 S. W. (2d) 1008; 56 A. L. R. 529; Walker v. Sellers, 201 Ala. 189, 77 So. 715; Anderson v. Bank of Tupelo, 135 Miss. 351, 100 So. 179; Montana-

Wyoming Association of Credit Men v. Commercial National Bank of Miles City, 80 Mont. 174, 259 P. 1060. Such being the nature of the obligation which was accepted in exchange for the claimant's check, it seems clear to us that it created an unconditional credit in favor of the National. City Bank which was reflected by appropriate entries on the books of the Bank of United States. Matter of Bank of United States, 264 N. Y. 414, 191 N. E. 491. The Bank of United States remained the debtor, and the only debtor, to the holder of its cashier's check for the amount of the deposit. * * * *"In re Bank of United States, supra.

And see Lindsay v. Elliott, 77 F. (2d) 95.

■ It is the general rule "that money paid to another under the influence of a mistake of fact, that is, on the mistaken supposition of the existence of a specific fact which would entitle the other to the money, which would not have been paid if it had been known to the payer that the fact was otherwise, may be recovered, provided the payment has not caused such a change in the position of the payee that it would be unjust to require a refund." 40 Am. Jur., § 187, p. 844. The test which determines whether a recovery may be had is whether the defendant in equity and good conscience is entitled to retain the money to which the plaintiff asserts claim. 40 Am. Jur., Payment § 187, p. 844; Scott v. Ford, 45 Or. 531, 78 P. 742, 80 P. 899, 68 L. R. A. 469; Smith v. Rubel, 140 Or. 422, 13 P. (2d) 1078, 87 A. L. R. 644; Restatement, Restitution, §§ 15 to 26, incl.

■ It is also the general rule that the failure of the payor to exercise ordinary care to avoid mistake will not as a matter of law defeat his recovery. Smith v. Rubel, supra; 40 Am. Jur., Payment § 194. But it is held that ignorance of facts "must be excusable;

that is, it must not arise from the intentional neglect of the party to investigate them." *Scott v. Ford,* supra, at 552. *Smith v. Rubel,* supra, at 427; 40 Am. Jur., Payment § 194, p. 848. And under the Restatement of Restitution, §§ 15 and 16, negligence may be relevant in determining whether it is equitable to allow recovery. Restatement, Restitution § 15, comment b; § 16, comment b; and 142, comment c. And see Restatement page 574.

■ It is not every payment of money by mistake for which restitution is allowed. Payments induced by mistake of law are not recoverable, although, as said by Justice Wolverton in *Scott v. Ford,* supra:

> "In the abstract, it was assuredly against conscience in any of these cases for the parties receiving the money to retain it, for they parted with no adequate or material consideration for it; yet, when connected with the facts of the cases, the courts say that, having paid voluntarily, with knowledge of the facts, but under a mistake of law, the money so paid is not recoverable, and, in effect, that it is not inimical to the maxim Ex aequo et bono, or against good conscience, for the one receiving it to retain it." *Scott v. Ford,* supra.

■ Money paid as a volunteer with knowledge of the facts and not induced by duress or fraud cannot be recovered back. *Gabel v. Armstrong,* 88 Or. 84, 87, 171 P. 190; *Eugene v. Lane County,* 50 Or. 468, 93 P. 255. Even in the case of payments made by mistake of fact, restitution may be denied under some circumstances.

> "A person who confers a benefit upon another, manifesting that he does so as an offer of a bargain which the other accepts or as the acceptance of an offer which the other has made, is not entitled to restitution because of a mistake which

the other does not share and the existence of which the other does not know or suspect." Restatement, Restitution, § 12.

"A person who has paid to another money which the other honestly claimed to be due but which was not due is not entitled to restitution merely because of his mistaken belief that the evidence to disprove the claim did not exist or was not available." Id. § 27.

It is highly significant that the authors of the Restatement on Restitution, among whom there are such eminent authorities at Seavey, Scott, Bohlen and Williston, deemed it necessary to state the "Special Rules for Bills and Notes" under a separate title. Sections 30 to 38 are modifications as applied to bills and notes of the earlier general rules relative to recovery of payments made by mistake. Rule 33 is directly in point and, unless rejected by us, must control the decision of this case. It is as follows:

"The holder of a check or other bill of exchange who, having paid value in good faith therefor, receives payment from the drawee without reason to know that the drawee is mistaken, is under no duty of restitution to him although the drawee pays because of a mistaken belief that he has sufficient funds of the drawer or that he is otherwise under a duty to pay." Restatement, Restitution § 33.

"* * * The *payee* is entitled to retain the money which he has received as a bona fide purchaser. The typical cases are those where an employee of a bank pays the holder of a check in a mistaken belief that the drawer has sufficient funds on deposit to meet it or in forgetfulness of the fact that the drawer has directed that payment should not be made. * * *" (Italics ours.) Id. § 33, comment a.

"A draws a check for $1000 on the B bank in which he has funds only amounting to $500, mak-

ing the check payable to C who receives it in satisfaction of a mortgage. Without reason to know of the state of A.'s account, C demands and receives payment from B. B is not entitled to restitution from C.'' Id. § 33, Illustration 1.

It will be observed that in both the rule and illustration there is no requirement that the recipient of the payment shall have changed his position to his detriment in reliance upon the payment. We have, however, already intimated that in a commercial transaction involving negotiable instruments the payment by and the surrender to the drawee of the bill or the check which carries the drawer's signature may, as a matter of law, be deemed a change of position such as would make restitution inequitable.

■ Rule 33 of the Restatement is not a solitary exception to the general rule. Restitution is denied where the bank under similar circumstances pays by reason of a mistake as to the identity of the drawer. Restatement, Restitution, comment a, p. 139. A similar rule which we think indistinguishable in principle is set forth in the Restatement as follows:

''The holder of a bill of exchange or promissory note who has received payment thereof from one whose name was forged thereon as a party, or from a drawee on a bill on which the drawer's name was forged, is not thereby under a duty of restitution if he paid value and received payment without reason to know that the signature was forged. * * *

''Comment: * * * The rule also applies where the holder of a bill of exchange on which the name of the drawer is forged receives payment from the drawee, with or without prior acceptance and irrespective of whether the holder became such before or after acceptance.'' Id. § 30

Section 30 of the Restatement embodies the rule of *Price v. Neal*, 3 Burr 1354, decided by Lord Mansfield

in 1762. The doctrine has been carried into the Uniform Negotiable Instruments Law, O.C.L.A. §§ 69-503, 69-1002 and 69-1005 (N. I. L. §§ 62, 185, 188). Although the word "accepting" and not the word "paying" is employed in O. C. L. A., § 69-503, this court has held that the section includes payment as well as acceptance of a bill. Under that section when a holder for value in due course presents a check on which the name of the drawer has been forged, "and the drawee pays the instrument, the holder and drawee being alike ignorant that the signature of the ostensible drawer was forged, and it is subsequently discovered that the signature of the drawer was forged, the drawee cannot recover the payment made to the holder." *First National Bank v. United States National Bank,* 100 Or. 264, 272, 197 P. 547, 14 A. L. R. 479. And see 100 Or. page 279.

In that case the name of the drawer was forged on checks drawn on the drawee First National Bank. The forgers, as payees, endorsed them to various merchants who deposited them for collection in the United States National. They were paid through the clearing house by the drawee. On discovery of the forgery the drawee sued the United States National for restitution. There was no purchase of the paper on the faith of a previous certification or acceptance by the drawee. It was a simple case of payment to one who had previously acquired the paper for value and in good faith. Yet this court held that the drawee had no right of restitution.

The rule of *Price v. Neal,* as adopted in Oregon, is too firmly established to permit question at this time. The only required act of reliance or change of position is the acceptance in good faith of payment. No distinction is made between the case of one

who, as indorsee after acceptance of a forged bill, receives payment, and the case of one who as holder receives payment without prior acceptance.

In the case of *National Bank of Commerce v. Baltimore Commercial Bank*, 141 Md. 554, 118 Atl. 855, 29 A. L. R. 135, there was a dictum to the effect that certification can be revoked on the ground of mistake as to the sufficiency of the drawer's funds. We quote from Brannan's Negotiable Instruments Law as follows:

> "The dictum is questionable. An acceptor can not revoke his acceptance because of a mistake as to the genuineness of the drawer's signature, under sec. 62, and it is equally within his power to ascertain the state of the drawer's account before accepting, so that this type of mistake should also be held insufficient to justify revocation. Change of position should be unnecessary as in the forgery cases." Brannan, Negotiable Instruments Law (6th ed.) § 187, p. 1150.

■ A payee of a negotiable instrument is a holder, O. C. L. A. § 69-1001, N. I. L. § 191, and may be a holder in due course if he brings himself within the provisions of O. C. L. A. § 69-402, N. I. L. § 52. *American National Bank v. Kerley*, 109 Or. 155, 220 P. 116, 32 A. L. R. 262; Brannan, op. cit. page 543; 97 A. L. R. 1215. The Nobles were holders whose position was similar to that of the holder in *First National Bank v. United States National Bank*, supra. They paid value for the bill and received payment thereof without reason to know that the Kelleck check was N.S.F., "a change of position should be unnecessary," except as may arise by operation of law.

Other instances in which restitution is denied, despite the fact that payment was made by mistake, are

cited in the Restatement of the Law of Restitution, § 31, "Raised Instruments," and § 32, "Spurious Accompanying Security."

Plaintiff relies strongly upon the case of *Security Savings & Trust Co. v. King*, 69 Or. 228, 138 P. 465, as establishing the right of restitution in Oregon. That was an action by the Security Savings & Trust Company, as plaintiff, to recover from the defendant King, one of its depositors, the amount of an alleged overdraft. Dempster, as drawer, on September 27, 1911, issued and delivered to King a check on the Imperial Bank of Canada, payable in cash. King deposited it for collection in the plaintiff bank in Portland. The deposit was made upon the terms of a written contract between the depositor and the bank which reads in part as follows:

> "In receiving checks, drafts or other paper on deposit payable elsewhere than in Portland this bank assumes no liability for the failure of any of its direct or indirect collecting agents whether the collecting agent be the person or concern on which the check for collection is drawn or not, and shall only be held liable when proceeds in actual funds or solvent credits shall have come into its possession. Under these provisions items previously credited may be charged back to the depositor's account. * * * *"

Upon the deposit of the check by the defendant in the plaintiff bank, the plaintiff immediately forwarded it to its correspondent, the Northern Crown Bank, at Vancouver, B. C. On the day of its issuance the drawer notified the drawee bank not to pay the check. In the forenoon of September 30, the Crown Bank presented the check to the drawee Imperial Bank for payment. The drawee overlooked the stop pay-

ment order of the drawer and by mistake certified the check and charged the account to the drawer. The Crown Bank received the certified check, charged the account of the Imperial Bank and remitted the amount out of its own funds to the plaintiff bank. On the evening of the same day the drawee bank discovered the error and immediately notified the Crown Bank. The notice was received, however, after the remittance by the Crown Bank to the plaintiff. The Crown Bank then wired the plaintiff that the drawer's check was "unpaid and remitted for by us today in error." The plaintiff bank exhibited to the defendant the contents of the wire, whereupon the defendant left for Vancouver, B. C., from which point on October 4 he wired the plaintiff that if it would return the check to him he would make collection. The defendant received the check but failed to make collection and returned it to the plaintiff. The plaintiff received notice of the erroneous remittance four days before the receipt by it of the draft from the Crown Bank. On receipt of the draft and on October 4, the plaintiff remitted to the Crown Bank the amount involved which canceled the credit previously given the defendant. In the meantime the defendant had cashed checks on the plaintiff bank which created an apparent overdraft and for which the plaintiff brought suit. It was held on appeal that the plaintiff bank was entitled to recover.

The court said: "In a consideration of this case, the mind must keep before it the terms of the contract had between plaintiff and defendant * * *." The contract provided that the plaintiff "shall only be held liable when proceeds in actual funds or solvent credits shall have come into its possession. Under these provisions items previously credited may be

charged back to the depositor's account." But that was not the entire contract. It was also agreed that "this bank assumes no liability for the failure of any of its direct or indirect collecting agents whether the collecting agent be the person or concern on which the check for collection is drawn or not * * * ."

By the depositor's contract the plaintiff bank assumed no liability for the failures of either the Crown Bank or the Imperial Bank on which the check was drawn. The evident import of the contract was that receipt of funds by plaintiff's agent should not be deemed receipt by the plaintiff who should become liable only when actual funds or solvent credits shall have come into its possession. It follows that as between the plaintiff and the defendant, the plaintiff was free to charge the check back against the defendant's account and remit to the Crown Bank the amount of the draft which it had received. This court said: "Proceeds in actual funds mean the real funds inuring from a collection of the check or negotiable paper free from embarrassment and convertible into cash." When the defendant first deposited with plaintiff the drawer's check for collection, he received a conditional credit which never became absolute, for the plaintiff never personally received negotiable paper "free from embarrassment and convertible into cash." The court in the King case cites *Scott v. Ford,* and then says:

"And in case of payment by a bank to the owner of paper deposited with it for collection the same rule applies, so that money paid under a mistake of fact may be recovered, although there was negligence on the part of the bank in remitting the payment, subject to the condition that payment cannot be realized if the position of the person to whom the payment had been made has been changed to his prejudice toward his debtor in con-

sequence of the payment * * *." *Security Savings & Trust Co. v. King,* supra.

The only authority cited is 2 Michie, Banks and Banking (1913 ed.) § 169.

Both the rule as stated by the court and the authority cited relate to a situation wholly different from that in the case at bar. Michie § 169 upholds the right of restitution in the case of negligent payment by a bank to the owner of paper deposited with it for collection. *As between the collecting bank and its depositor,* this court and the authority cited adopted the general rule of *Scott v. Ford* which permits restitution if the recipient of the payment has not changed his position, but the same volume and edition of Michie, on which this court relied in the King case, lays down a different rule in the case of payment by mistake made by the drawee to the holder.

> "In the absence of fraud on the part of the holder, the payment of a check by a bank is regarded as a finality, and the fact that the drawer has not funds on deposit will not give the bank any remedy against the holder." 2 Michie, Banks and Banking (1913 ed.) § 142 (2b) and (2ba).

> "A mistake in regard to the amount of a customer's deposit is not such a mistake of fact as entitles a bank paying a check to recover back the amount from the payee. Such transaction is not a mistake of fact in a legal sense, only laches. Banks are supposed to be informed of a depositor's financial standing, and to know the condition of his account with them at the time of presentation of checks for payment. They are required, and for their own safety are compelled, to know at all times the balance to the credit of each individual customer, and they accept and pay checks at their own risk and peril. If from negligence or inattention to their own affairs banks improvidently pay when

the account of a customer is not in a condition to warrant it, and if by mistake a check is paid when the drawer has no funds, the bank must look to the customer for rectification, not to the party to whom the check was paid. * * * '' 2 Michie, Banks and Banking (1913 ed.) § 142 (2bd).

The same rule is found supported in 5 Michie, Banks and Banking (perm. ed.) § 229, p. 418.

Other authorities which support the rule of § 33 of the Restatement on Restitution, either directly or by close analogy, are as follows: *First National Bank v. Burkhardt,* 100 U. S. 686, 25 L. Ed. 766; *Levy v. The Bank of United States,* 4 Dall. 234, 1 L. Ed. 814; *Hayes v. Tootle-Lacy Nat. Bank* (C.C.A. 10th), 72 F. (2d) 429; *Security Nat. Bank v. Old Nat. Bank* (C. C. A. 8th), 241 Fed. 1; *Riverside Bank v. First Nat. Bank of Shenandoah,* supra; *Bank of Moulton v. Rankin,* 24 Ala. App. 110, 131 So. 450; *First Nat. Bank v. Devenish,* 15 Colo. 229, 25 P. 177; *Bank of Commerce v. Reis,* 253 Ky. 648, 69 S. W. 754; *Thompson v. First State Bank of Irvington,* 216 Ky. 703, 288 S. W. 702; *First National Bank v. Sidebottom,* 147 Ky. 690, 145 S. W. 404; *Neal v. Coburn,* 92 Me. 139, 42 Atl. 348; *National Exchange Bank of Baltimore v. Ginn & Co.,* 114 Md. 181, 78 Atl. 1026; *Manufacturers' National Bank v. Swift,* 70 Md. 515, 17 Atl. 336; *Dedham National Bank v. Everett National Bank* (opinion by Holmes, C. J.), 177 Mass. 392, 59 N. E. 62 (cited with approval in *First Nat. Bank v. United States Nat. Bank,* supra); *Boylston National Bank v. Richardson,* 101 Mass. 287; *Withers v. Jefferson Trust Co.,* 123 N. J. Eq. 113, 196 Atl. 442; *Liberty Trust Co. v. Haggerty,* 92 N. J. Eq. 609, 113 Atl. 596; *National Bank of New Jersey v. Berrall,* 70 N. J. L. 757, 58 Atl. 189; *Oddie v. The Nat. City Bank,* 45 N. Y. 735; *Bank of State of South Carolina v. Hull,* Dud. (S. C. L.)

259; *Huffman v. Farmers' Nat. Bank* (Tex.), 10 S. W. (2d) 753; *Citizens' Bank v. Schwarzschild & Sulzberger Co.*, 109 Va. 539, 64 S. E. 954; *Oregon Iron & Steel Co. v. Kelso State Bank*, 129 Wash. 109, 224 P. 569; *Spokane & Eastern Trust Co. v. Huff*, 63 Wash. 225, 115 P. 80; *Pollard v. Bank of England*, L. R., 6 Q. B. 622; 7 Am. Jur., Banks § 611, p. 443; 9 C. J. S., Banks and Banking § 354, p. 722 et seq.; 2 Morse, Banks and Banking (6th ed.) § 445, p. 1001; 7 Zollmann, Banks and Banking (perm. ed.) § 5062, p. 445.

To the foregoing must be added the weighty authority of Professor Williston who says:

"If a bank pays a draft or check on the mistaken assumption that the drawer has sufficient funds to his credit to meet the instrument, no recovery of payment can be had if this assumption turns out to be an error." 5 Williston, Contracts (rev. ed.) § 1572, p. 4396.

The reasons which support the rule denying restitution in the case of payment by the drawee of a forged check apply also in the case at bar. As said by Justice Harris in *First Nat. Bank v. United States Nat. Bank*, supra:

"Some judges rest the rule upon grounds of estoppel; others say that it is governed by the principles of negligence; and still others invoke the principle of natural justice, that as between two persons one of whom must suffer, the legal title shall prevail. Frequently the suggestion is made that the rule arises out of considerations of convenience as well as of commercial necessity; for, it is said, throughout the entire business world bills of exchange and checks in large part serve as currency in each day's business transactions, and it is not only convenient but necessary that there shall be a definite time and a fixed place for final settlement and that the best time and most appropriate

place for such final settlement is the time and place when and where an instrument is presented to the drawee for payment * * *." *First Nat. Bank v. United States Nat. Bank,* supra.

The forgery cases are said to rest, in part at least, upon the maxim that where the equities are equal the legal title must prevail. That maxim appears applicable where the drawee bank pays a check so skillfully forged as to defy detection. The holder and the drawee are equally without fault, and the holder has the money.

The position of the defendants in the case at bar is in this respect stronger than that of one who has received payment of a forged check. Here the equities are not equal. The representative of the plaintiff was clearly negligent. He acted in reliance on a symbol which he had never before seen and the meaning of which he had no reason to know. A moment's inquiry would have informed him fully concerning the meaning of the symbol and the state of Kelleck's account. But no inquiry was made. His conduct closely approximates that of one who intentionally neglects to investigate the facts. Even under the doctrine of *Scott v. Ford* and *Smith v. Rubel,* supra, and without reference to the special rules governing bills and notes, such a one cannot recover for payment made by mistake.

■ The defendants Noble are not chargeable with any neglect or inequitable conduct. Neither they nor their collecting agent knew or were entitled to know the state of the Kelleck account, and the fact that the Kelleck check was N. S. F. on September 22 did not render it unconscionable to present it again on September 24. *Freeport Bank of Freeport v. Viemeister,* 227 App. Div. 457, 238 N. Y. S. 169, 175.

We have examined with utmost care the cases cited by the plaintiff and which are opposed to the authorities upon which we rely. We reject them as being less in harmony with the necessities of commercial usage. The commercial transactions of banks involving negotiable instruments are no longer restricted to a single locality or state. Such transactions have become truly national in character and both certainty and uniformity are essential.

■ The monumental work of the American Law Institute in the preparation of the Restatement was motivated by the avowed purpose to accomplish in the future, uniformity of decision throughout the Union, notwithstanding the welter of conflicting decisions in the several states. In no field is such uniformity more essential than in this. Subject to the equitable exceptions set forth in the Restatement of Restitution (§ 34), we adhere to the rule of § 33, supra, which is decisive in this case.

■ The defendants Noble assign as error the decree of interpleader whereby the U. S. National was discharged upon paying the money into court. That order was signed on July 12, 1944; the final decree on December 14th of that year. The former purported to determine the rights of the U. S. National, but it did not determine the rights of the other parties. It was not an appealable order. *In re Norton's Estate,* 175 Or. 115, 151 P. (2d) 719, 156 A. L. R. 617; *Hoff v. Peninsula Drainage District,* 172 Or. 630, 143 P. (2d) 471; *Murray v. Lamb,* 168 Or. 596, 115 P. (2d) 336, 124 P. (2d) 531; *Abrahamson v. Northwestern Pulp & Paper Co.,* 141 Or. 339, 15 P. (2d) 472, 17 P. (2d) 1117. And see 4 C. J. S., Appeal and Error, § 118b.

■ Under our practice, the question as to the propriety of the intermediate decree on interpleader was

raised by the appeal from the final decree of December 14th. See *New Zealand Ins. Co. v. Smith,* 41 Or. 466, 69 P. 268. If the right of interpleader had been denied it, the U. S. National would have been compelled to decide the merits of a legal controversy before the trial was completed, and at its peril. If at that time the bank had arrived at the same conclusion which we now reach and had honored checks of the Nobles against the deposit, it would still have been compelled to defend against the action of the plaintiff. If it decided the question of law as the lower court did and reimbursed the plaintiff, it would have been liable under our present decision to pay a second time. to the Nobles. If it had refused to pay either it would probably have been subjected to actions at law by both claimants with expense incurred in each case, and costs to the prevailing party in one.

Speaking of a bill of interpleader, Justice WOLVERTON for this court said:

"Such a bill will lie where two or more persons claim the same thing or debt or duty from the complainant by different or separate interests, and he does not know to which of the claimants he ought of right to deliver the thing in his custody or render the debt or duty, and by reason thereof is in fear of damage or hurt from some of them * * *.

"The allegations such a bill should contain are, in purport, (1) that two or more persons have preferred claims against the complainant; (2) that they claim the same thing; (3) that the complainant has no beneficial interest in the thing claimed; and (4) that he cannot determine without hazard to himself to which of the several defendants the thing belongs: Atkinson v. Manks, 1 Cow. 703." *North Pacific Lumber Co. v. Lang,* 28 Or. 246, 42 P. 799, 52 Am. St. Rep. 780.

The court also said:

"One of the essential requisites to equitable relief by bill of interpleader is that all the adverse titles of the respective claimants must be connected or dependent, or one derived from the other, or from a common source. There must be privity of some sort between all the parties, such as privity of estate, title, or contract, and the claims should be of the same nature and character." *North Pacific Lumber Co. v. Lang*, supra.

And see *Massachusetts Mut. Life Ins. Co. v. Murdoch*, (Ore.) 56 F. Supp. 500 (opinion by Fee, J.); 30 Am. Jur., Interpleader § 8, p. 218.

The petition in intervention in the case at bar appears to satisfy the requirements set forth in *North Pacific Lumber Co. v. Lang*, supra. It is suggested, however, that interpleader will not lie because of the rule that a bank is not entitled to interplead rival claimants to a deposit where the facts are such that it has incurred an independent liability to one of the claimants. In support of this position it may be said that the U. S. National had incurred an independent liability to the Nobles when it credited them with the amount of the cashier's check if not sooner. This argument, we think, results from a misunderstanding of the meaning of the independent liability rule. As said in *North Pacific Lumber Co. v. Lang*, supra:

" 'The difficulty of maintaining a bill of interpleader is not technical, but fundamental. In this form of proceeding we can not inquire whether the plaintiff has incurred a double liability. That result is possible. The plaintiff ought to be in a position to be heard upon the question; but, on a bill of interpleader, which assumes that the plaintiff is merely a stakeholder, the plaintiff can not be heard: Houghton v. Kendall, 7 Allen. 72. *A plaintiff can not have an order that the defendants*

*interplead, when one important question to be tried
is whether, by reason of his own act, he is under
a liability to each of them.'*" *North Pacific Lumber Co. v. Lang,* supra. (Italics ours.)

In *First National Bank v. Reynolds,* 127 Me. 340,
143 Atl. 266, 60 A. L. R. 712, it was held "that the mere
fact that a contractual relation exists between the plaintiff and one of the defendants, under which the fund is
required to be paid to such claimant, does not of itself
defeat the right of interpleader by a bank; but that
the independent obligation covered by the rule must
be such that the litigation between the defendants
will not determine it in order to warrant the dismissal
of the bill." *First National Bank v. Reynolds,* supra.

In *Bergen County Nat. Bank v. Sheriff of Bergen
County,* 121 N. J. Eq. 517, 191 Atl. 560, the court said:

"Considered in the light of modern thought
and the recent decisions of this court and that of
our Court of Errors and Appeals, the legal effect
of the contractual relation arising between a bank
and its depositor upon and from the mere opening
of a bank account is, of itself, not sufficient to
defeat the bank's right of interpleader as against
such depositor and adverse claimants to the funds
on deposit with it. Trust Company of New Jersey
v. Biddle et al., 112 N. J. Eq. 347, 164 A. 583;
Camden Safe Deposit & Trust Co. v. Barbour et al.,
117 N. J. Eq. 401, 176 A. 313, 97 A. L. R. 993. Were
the law otherwise, it would, indeed, be most difficult
to conceive of a set of facts under which a bank
or other custodian of funds would ever be able
to maintain an interpleader action against the depositor and the adverse claimants of the deposited
funds.

"It is, and should be, the policy of this court
to afford protection to persons occupying the status
of stakeholders or agents, whose only interest in
the property claimed is an honest desire to pay or

deliver it to whomsoever may be rightfully entitled thereto, from the vexation incidental to the litigation which may possibly be brought against them by the various adverse claimants of the property involved. *Lozier's Ex'rs v. Van Saun's Adm'rs,* 3 N. J. Eq. 325. Unqualified approval of this just and equitable principle, despite the complainant's existing independent liability to one of the defendants, is to be found in the cases of *Leber et al. v. Ross et al.,* 92 N. J. Eq. 535, 113 A. 606 (where complainants were permitted to maintain their interpleader suit as against the person for which they held, and to whom in writing they had agreed to pay, the fund and the other claimants thereto) * * *." *Bergen County Nat. Bank v. Sheriff of Bergen County,* supra.

See also *Jones v. Walsh,* 194 Miss. 247, 11 So. (2d) 908; *Phillips v. Alford* (Mo. App.) 90 S. W. (2d) 1060; *Camden Safe Deposit & Trust Co. v. Barbour,* 117 N. J. Eq. 401, 176 Atl. 313; *Trust Company of New Jersey v. Biddle,* 112 N. J. Eq. 347, 164 Atl. 583; *Sasanow v. Williamsburg Sav. Bank,* 9 N. Y. S. (2d) 782; *Slaymaker v. Snyder County State Bank,* 308 Pa. 271, 162 Atl. 217; *Old Colony Co-op Bank v. Burger,* 63 R. I. 223, 7 Atl. (2d) 725. And in *Gillespie v. Citizens Nat. Bank of Weatherford* (Ct. of Civ. App., Tex.) 97 S. W. (2d) 310, it was held that "In determining sufficiency of facts to authorize remedy of interpleader, every reasonable doubt should be resolved in favor of the right to the bill." See also 5 Michie, Banks and Banking § 362, p. 694; 60 A. L. R. 719 (Annotation of right of bank to interplead rival claimants to deposit); 30 Am. Jur., Interpleader § 5, p. 216.

In the case at bar the parties are not asserting independent and paramount claims. The Nobles' claim grows out of a payment made by the First National to the collecting bank on an obligation belonging to

the Nobles. There was privity between the contesting parties.

■ We think the true test is whether the litigation between the rival claimants will fully determine all of the issues in the case. *Hancock Oil Co. v. Independent Distributing Co.,* (1944) 24 Cal. (2d) 497, 150 P. (2d) 463. If there is a right to restitution of money paid by mistake under the circumstances existing in the case at bar, then the plaintiff was entitled to the deposit. If there was no right of restitution, then clearly the Nobles were entitled to the deposit. A decision of the issue between these parties will constitute a final determination of all of the issues of the case.

The contestants claim the identical deposit. The U. S. National claims no part of it. It has not incurred any such independent liability to either party as would require it to pay the amount of the deposit to the one if the court should hold that the other was entitled to the deposit. In crediting the Nobles' account, the defendant incurred a liability to them, but under the facts of this case that was one of the questions of law which has been decided in this litigation. There was reasonable ground for difference of legal opinion as to which contestant was entitled to the deposit, as witness the course of this litigation below and in this court, an uncertainty which could be resolved only by our decision. The right to interpleader cannot be decided retrospectively on the basis of our decision. It was necessary to decide the question before the legal rights of the contestants had been decided or even litigated. The U. S. National flagged the Noble account, paid the money into court and now stands as an impartial stakeholder.

■ The office of interpleader is not necessarily to protect against double liability; it is to protect

against double vexation with respect to one liability. *Pratt v. First Nat. Bank of Fayette,* 243 Ala. 257, 9 So. (2d) 744. The trial court committed no error in entering a decree requiring the plaintiff and the defendants Noble to interplead and in discharging the U. S. National from liability. The trial court had the power in its discretion to award a reasonable attorneys' fee.

The decree in favor of the First National Bank is reversed. It is ordered, adjudged and decreed that the defendants Noble recover the sum of $10,573.50 paid into the registry of the court, less the attorneys' fee and court costs provided for in the interlocutory decree of July 12, 1944, and that the clerk of the Circuit Court forthwith pay unto the said defendants the said sum less said attorneys' fee and costs. The decree is affirmed as to the United States National Bank. The defendants Noble may have their costs and disbursements from the plaintiff First National Bank. Except as above stated, the United States National Bank shall not recover costs.

---

HAY, J., dissenting:

One Kelleck, having only $200 to the credit of his account, drew his check on First National Bank in favor of Mrs. Lillian S. Noble for $10,573.50. She deposited the check, for collection, to the credit of the joint account of her husband and herself with United States National Bank. Because of insufficient funds, First National refused payment. Two days afterwards, United States National presented the check to the drawee, by messenger. A teller, mistaking a rejection symbol which had been placed thereon for a symbol of approval, issued a cashier's check in payment. United States National, which had charged

back the check to the Nobles' account when payment was refused, recredited the account and mailed the Nobles an advice of credit. The cashier's check was cleared through the clearing house. First National made timely demand for a refund of the credit thus procured, which was refused. Thereupon First National brought the present suit against the Nobles and United States National to recover the amount of the cashier's check as money paid under a mistake of fact. United States National interpleaded the Nobles and First National, and paid the money into court. The question is whether, under those circumstances, First National can recover. The lower court held in its favor.

Money paid under a mistake of fact may be recovered, unless the recipient has so changed his position that it would be unjust to require him to refund. 40 Am. Jur., Payment, section 187; *Scott v. Ford,* 45 Or. 531, 78 P. 742, 68 L. R. A. 469; *Smith v. Rubel,* 140 Or. 422, 13 P. (2d) 1078, 87 A. L. R. 644; *Security Savings & Trust Co. v. King,* 69 Or. 228, 138 P. 465.

Ordinarily, a cashier's check is not subject to countermand except for fraud. It has been held, however, that payment may be refused, for want or failure of consideration, while the check is still held by the payee, but, in the hands of a holder in due course, it is irrevocable. *Kinder v. Fisher's Nat. Bank,* 93 Ind. App. 213, 177 N. E. 904; Annotations, 56 A. L .R. 532, 107 A. L. R. at 1464. By the weight of authority, a drawee who, through mistake of fact, pays a negotiable instrument to a holder in due course, cannot recover the money. There is a plausible reason for this. Bills and notes were devised and used by merchants, for reasons of safety and convenience, to take the place of money, and, in order that they might circulate freely

in the channels of trade, it became necessary that they should be negotiable. Carter: History of English Legal Institutions, 3 ed., 274. If a holder in due course were subject to claims for refund of money paid under mistake of fact, the free flow of trade and commerce would be gravely hindered. A bill or note which remains in the hands of the payee is not in "the channels of trade". It does not enter such channels until it reaches a holder in due course. To say that payment to the payee, *simpliciter*, under mistake of fact, cannot be recovered, is to invest payee with the status of a holder in due course, a status which in his case cannot be justified, in point of law, by any amount of rationalization. The effect would be, moreover, to prevent the drawee from urging, as between immediate parties, that there was no consideration for the payment. It is true that, in *American National Bank v. Kerley* (1923) 109 Or. 155, 220 P. 116, 32 A. L. R. 262, this court did say that, within the purview of the negotiable instruments law, a payee may be a holder in due course. This statement, however, has been criticized (rightly, as I think) as dictum. The action was by the payee of a note against accommodation makers. Their defense was that they were induced to sign by fraud of the principal maker, of which fraud the payee, before delivery, had notice. The accommodation makers had intrusted the note, with their signatures thereon, to the principal maker, and had clothed him with apparent authority to make delivery to the payee. If the payee actually had no knowledge of the fraud before delivery (as to which the court made no finding) the decision, wherein it indicated that the accommodation makers would be liable to the payee as holder in due course, would have been more correctly based, I think, upon prin-

ciples of estoppel. *Baker County v. Huntington,* 46 Or. 275, 79 P. 187; *Wollenberg v. Sykes,* 49 Or. 163, 89 P. 148; Anno: 15 A. L. R. at 445, 446. Under the circumstances, the court could have reached no different conclusion even if the note had been non-negotiable.

In *Jones v. Waring & Gillow* (1926) A. C. 670, 68 A. L. R. 944, it was finally settled as the law of England that, under a logical construction of the Bills of Exchange Act, the payee of a check cannot be a holder in due course. See, generally, annotations as follows: 15 A. L. R. 437; 21 A. L. R. 1365; 26 A. L. R. 769; 32 A. L. R. 289; 68 A. L. R. 962. This court, in *Bank of Gresham v. Walch,* 76 Or. 272, 147 P. 534, held that the payee of a note is not a holder in due course. In my opinion, such is the correct view. See Annotation, 32 A. L. R. at p. 291, in which the editors state that "a logical construction of the Negotiable Instruments Act supports the conclusion that the payee in a negotiable instrument cannot be 'a holder in due course,' within the meaning of that phrase as used in the act".

United States National did not disburse any of the ultimate proceeds of the Kelleck check to the Nobles or to their order. The only change in the Nobles' position was that reflected by a mere bookkeeping entry upon the bank's books, which another bookkeeping entry could have cancelled. *National Bank of California v. Miner,* 167 Cal. 532, 140 P. 27.

The drawer of a check "is discharged of liability as drawer when the drawee bank, *out of funds in its hands to his credit,* pays the check with money, or in any other medium accepted by the holder of the check." (Emphasis mine.) *Dewey v. Margolis & Brooks* (1928) 195 N. C. 307, 142 S. E. 22. See *Loland v. Nelson,* 139

Or. 581, 8 P. (2d) 82; *Texas Electric Service Co. v. Clark,* (Tex. Civ. App. 1932) 47 S. W. (2d) 483; 7 Am. Jur., Banks, section 684; Annotations, 52 A. L. R. at 995; 87 A. L. R. 442. Moreover, the record plainly indicates that the drawer intentionally defrauded Mrs. Noble by giving her a worthless check. The law will not permit him to take advantage of his own fraud. 23 Am. Jur., Fraud and Deceit, section 182. In my opinion, he was not discharged.

Section 33, Restatement, Restitution, appears to be authority against the right of the drawee to recover in this case. I submit, however, that the rule laid down therein should have been 'limited to denial of restitution from a holder in due course. The rule, in any event, is contrary to that adopted by this court in *Security Savings & Trust Co. v. King,* supra and post, 69 Or. 228, 138 P. 465.

The error of First National's employee was a mere failure to exercise ordinary care, and not, I think, "intentional" negligence, such as intentional failure to investigate, which, it has been held, might have prevented the bank from recovering the money. See *Smith v. Rubel,* 140 Or. 422, 13 P. (2d) 1078, 87 A. L. R. 644; *Scott v. Ford,* 45 Or. 531, 78 P. 742, 68 L. R. A. 469; *Security Savings & Trust Co. v. King,* supra.

> "No matter how close at hand the means of knowledge may be, no matter how stupid or careless the failure to ascertain the truth may be, if one confers a benefit under an honest mistake, i. e. in unconscious ignorance of the truth, the retention of the benefit is ordinarily inequitable. By the weight of authority restitution may be enforced." Woodward, Quasi Contracts, section 15.

Appellants cite *Price v. Neal,* (1762) 3 Burr. 1354. Stated broadly, the rule of *Price v. Neal* is that the

acceptor of a bill of exchange admits by his acceptance the genuineness of the signature of the drawer, and is estopped from afterwards asserting that such signature was forged. The decision does not aid appellants here, as Neal was a holder in due course. Where the negotiable instruments act has been adopted, the rule of *Price v. Neal,* as adopted by section 62, N. I. L. (section 69-503, O. C. L. A.) has no application unless the facts bring the case specifically within the purview of the act. For example, it has no application to a negotiable instrument properly signed by the drawer but bearing a forged indorsement. In such cases, common-law principles are applied, and the drawee who has paid the instrument is permitted to recover. *First National Bank v. United States National,* 100 Or. 264, 197 P. 547, 14 A. L. R. 479. It would seem, therefore, that the situation in the instant case, not having been provided for by the negotiable instruments act, should likewise be governed by common-law rules.

The situation here is analogous to that in which a bank has certified a check by mistake. The general rule is that such certification may be revoked, unless revocation would operate to the prejudice of an innocent party. Morse, Banks and Banking, 6 ed., section 419, (citing *Security Savings & Trust Co. v. King,* supra) ; 7 Am. Jur., Banks, section 563 ; 9 C. J. S., Banks and Banking, section 376a; *Metropolitan Life Ins. Co. v. Bank of United States,* 259 N. Y. 365, 182 N. E. 18; *National Bank of Commerce v. Baltimore Commercial Bank,* 141 Md. 554, 118 A. 855, 29 A. L. R. 135.

In *Security Savings & Trust Co. v. King,* supra (69 Or. 228, 138 P. 465) plaintiff bank received on deposit for collection a check drawn on Imperial Bank of Can-

ada, Vancouver, B. C., under an agreement that the bank would be held liable only when proceeds of the check in actual funds or solvent credits should come into its possession. Plaintiff sent the check to its Vancouver correspondent, Northern Crown Bank, which bank procured certification by the drawee. In so certifying, the drawee "forgot" that it had previously received instructions from the drawer to stop payment. From its own funds, Northern Crown remitted to plaintiff the amount of the certified check. Later, the drawee discovered its error and notified Northern Crown, which informed plaintiff, by telegraph, of the situation, the telegram being received four days before Northern Crown's remittance reached plaintiff. Plaintiff meantime had honored other checks of the drawer to the extent that charging back the Canadian check caused an overdraft. Plaintiff reimbursed Northern Crown, and brought suit against the depositor to recover the amount of the overdraft. In the lower court, the defendant had judgment. On appeal, this court held that, under the express contract between the parties, no liability attached to plaintiff until the proceeds of the collection, in actual funds, came into its possession. We defined "actual funds" as "the real funds inuring from a collection of the check or *negotiable paper free from embarrassment and convertible into cash.*" (Emphasis mine.) We held that, since defendant's position had not changed, and the rights of third parties had not intervened, the case came within the rule permitting recovery of money paid under a mistake of fact. The express agreement between the bank and the depositor contained the following proviso:

"this bank assumes no liability for the failure of any of its direct or indirect collecting agents

whether the collecting agent be the person or concern on which the check for collection is drawn or not * * * ."

There was, however, no such failure. Northern Crown, the plaintiff's collecting agent, caused the check to be certified, and immediately remitted to plaintiff out of its own funds. This was clearly a payment to plaintiff, but the court impliedly approved plaintiff's action in reimbursing the agent. The case expressly holds that certification of a check under a mistake of fact may be revoked if the payee has not changed his position.

Brannan, Negotiable Instruments, 6 ed., section 187, p. 1150, includes *Securities Savings & Trust Co. v. King*, supra, as one of the cases opposed in principle to those cases which hold that a drawee bank cannot recover a payment made by mistake as to the condition of the drawer's account. I am of the opinion that, unless *Securities Savings & Trust Co. v. King*, supra, be overruled, it must be considered as authority for First National in the present case.

In so far as the facts in the case at bar are concerned, there is no legal distinction affecting the bank's liability to the holder as between a certified check and a cashier's check. Zollmann, Banks and Banking, vol. 7, Perm. ed., section 4691; see also section 69-1004, O. C. L. A.

The position of the Nobles, when this action was instituted, was no worse than it was when they first received the worthless Kelleck check. In equity and good conscience, the funds in court are the property of First National. I am of the opinion that the trial court decided the case correctly, and that its judgment should be affirmed. I respectfully dissent from the opinion of the majority.